UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM and OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | ) CASE NO. CV 13-08440 MMM (SHx) ) ) ) ) CLASS ACTION ) |
| Plaintiffs, | ) ) ORDER GRANTING DEFENDANTS' ) MOTIONS TO DISMISS |
| v. | ) ) |
| IXIA, a corporation, VICTOR ALSTON, an individual, ATUL BHATNAGAR, an individual, THOMAS B. MILLER, an individual, and ERROL GINSBERG, an individual, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Plaintiff filed this putative securities class action against Ixia and Victor Alston, Atul Bhatnagar, Thomas B. Miller, and Errol Ginsberg (the "individual defendants") on November 15, 2013. Plaintiffs allege that during the class period, defendants misled the public by improperly classifying Ixia's revenue. They assert that defendants sought to portray Ixia, which was exceeding its revenue and earnings per share targets during the class period, as a steady growth company. They contend that to foster this image, Ixia did not record certain present revenue and instead booked it as deferred revenue to give the impression that the company would continue to grow at an attractive rate in future quarters. Plaintiffs contend this misled inventors and caused them to conclude that Ixia's growth would continue

for some period of time.

They assert that by making these misleading statements, defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 during a class period that extended from November 28, 2007 to August 17, 2010.  They also contend that Alston, Bhatnagar, Miller, and Ginsberg violated § 20(a) of the 1934 Act because they were controlling persons of Ixia.[1]

 On June 11, 2014, plaintiffs filed a first amended complaint.[2]  Defendants filed various motions to dismiss on July 18, 2014.[3]  On October 6, 2014, the court granted defendants' motions and dismissed the first amended complaint with leave to amend.[4]  On November 5, 2014, plaintiffs filed a second amended complaint,[5] and on November 14, 2014, the court entered an order granting the parties' stipulation that set a briefing schedule for, and extended defendants' time to file, motions to dismiss the second amended complaint.[6]

On January 6, 2015, Ixia moved to dismiss the second amended complaint; each of the individual defendants joined Ixia's motion.[7]  Bhatnagar, Miller, and Ginsberg filed a joint motion to dismiss the same day, while Alston filed an individual motion to dismiss.[8]  Plaintiffs filed omnibus opposition on

---

[1]First Amended Class Action Complaint ("FAC"), Docket No. 61 (Jun. 11, 2014), ¶¶ 195-210.

[2]*Id*. at 1.

[3]Defendant Atul Bhatnagar, Errol Ginsberg, and Thomas B. Miller's Motion to Dismiss First Amended Complaint, Docket No. 81 (July 18, 2014); Defendant Ixia's Motion to Dismiss First Amended Complaint, Docket No. 83 (July 18, 2014); Defendant Victor Alston's Motion to Dismiss First Amended Complaint, Docket No. 85 (July 18, 2014).

[4]Order Granting Defendants' Motions to Dismiss, Docket No. 98 (Oct. 6, 2014).

[5]Second Amended Complaint ("SAC"), Docket No. 99 (Nov. 5, 2014).

[6]Stipulation and Order Granting Stipulation Regarding Filing of Briefing, Docket No. 101 (Nov. 14, 2014).

[7]Ixia's Motion to Dismiss the Second Amended Complaint ("Combined Motion"), Docket No. 104 (Jan. 6, 2015).

[8]Bhatnagar, Ginsberg, and Miller's Motion to Dismiss the Second Amended Complaint ("BGM Motion"), Docket No. 107 (Jan. 6, 2015); Alston's Motion to Dismiss the Second Amended Complaint

2

February 10, 2015.[9]

## I.  BACKGROUND AND FACTUAL ALLEGATION

### A.  Background Concerning Ixia, the Individual Defendants and the Plaintiff Class

Ixia was incorporated in California in 1997 and maintains its headquarters in Calabasas.[10]  Ixia's core operations focus on delivery of information technology solutions to a wide array of organizations through real-time monitoring and rapid assessment of network systems.  Its products are used to provide "end-to-end visibility" – a more complete understanding of user behavior, security vulnerabilities, network capacity, application performance, and information technology resiliency.[11]

Ginsberg founded Ixia in 1997; he has been chairman of its board of directors since January 2008 and chief innovation officer since March 2008.[12]  Alston joined Ixia in 2004 as vice president of application development.[13]  In 2006, he was promoted to vice president of engineering, and in June 2007 to senior vice president of product development.[14]  Alston became president and chief executive officer of the company in May 2012, and served in that capacity until his resignation on October 24, 2013.[15]  Bhatnagar was hired as Ixia's chief operating officer on September 4, 2007; he served as president and chief executive officer from March 2008 until Alston assumed the position in May 2012.[16]  Miller served

---

("Alston Motion"), Docket No. 108 (Jan. 6, 2015).

[9]Omnibus Opposition to Motion to Dismiss Second Amended Complaint ("Opposition"), Docket No. 109 (Feb. 10, 2015).

[10]SAC, ¶ 22.

[11]*Id.*

[12]*Id.*, ¶ 26.

[13]*Id.*, ¶ 23.

[14]*Id.*

[15]*Id.*

[16]*Id.*, ¶ 24.

as Ixia's chief financial officer from March 2000 to March 3, 2014.[17]

Plaintiffs allege that each of the individual defendants had authority to control the contents of Ixia's quarterly reports, annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.[18] Each of the individual defendants allegedly "received copies" of Ixia's press releases and reports "prior to or shortly after their issuance," and each purportedly "had the ability and opportunity to prevent their issuance or cause them to be corrected."[19] Plaintiffs contend that, as a result of their positions at Ixia, and their access to material nonpublic information, the individual defendants knew that the adverse information detailed in the complaint had not been publicly disclosed and was being concealed. As a result, each allegedly knew that the representations being made by the company were false and misleading.

Plaintiffs are public pension retirement funds that allegedly acquired shares of Ixia at artificially inflated prices during the class period and that have been damaged as a result.[20] They bring this class action on behalf of all persons who purchased or otherwise acquired Ixia's publicly traded common stock from February 4, 2011 to and including April 3, 2013.[21]

**B.    Defendants' Allegedly Fraudulent Scheme**

Plaintiffs allege that Ixia's common stock began to trade publicly on the NASDAQ on October 25, 2000.[22] Analysts viewed Ixia as a growth company in 2004 and 2005, and the price of its stock rose steadily from approximately $11 per share in early 2004 to more than $16 per share by the end of that year.[23] The share price continued to rise in 2005, as the stock traded in the high teens for the first half

---

[17]*Id.*, ¶ 25.

[18]*Id.*, ¶ 28.

[19]*Id.*

[20]*Id.*, ¶¶ 20-21.

[21]*Id.*, ¶ 236.

[22]*Id.*, ¶ 36.

[23]*Id.*

of the year and above $20 at some points during the second half of the year.[24] Ixia's growth began to slow at the end of 2005.[25] Plaintiffs allege that at this point, investors lost their enthusiasm for the stock, which declined in value to roughly $10 per share by the end of November 2005.[26] Ixia's stock price languished in the mid-single digits for the next several years. Miller admitted during a December 4, 2012 conference call that the Ixia was "in a little bit of a rut."[27] Plaintiffs allege that, as Ixia's stock fell out of favor with investors, the company was forced to restate the way it recognized its software service and warranty contracts.

Plaintiffs contend that the decline in Ixia's stock price occurred largely because it had fallen out of favor as a technology "growth" company.[28] By way of example, they allege that in a May 1, 2010 analyst report, Price Target Research noted that "Ixia's growth rate has slowed very considerably in recent years.[29] Annual revenue growth has been 10.6% per year. Total asset growth has been 9.6% per year. (More recently it has been 0.7%).[30] Annual [earnings per share] has been 7.1% per year.[31] Equity growth has been 7.3%. (More recently it has been -6.7%)."[32] Plaintiffs assert that as a result of this lackluster performance, Ixia sought to "reinvigorate investor enthusiasm and drive up the price of its common stock by convincing the public that it was once again a 'growth' company."[33] To accomplish this, Ixia purportedly employed a variety of unlawful methods, including: "(1) improperly inflating [its]

---

[24]*Id.*

[25]*Id.*, ¶ 37.

[26]*Id.*

[27]*Id.*

[28]*Id.*, ¶ 38.

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*, ¶ 39.

deferred revenues – a common indicator of a Company's growth prospects – in violation of [generally accepted accounting principles ("GAAP")], so that investors would believe that Ixia's growth would continue into future quarters; (2) promoting Alston to the position of CEO because Ixia's board believed his reputation for being 'aggressive' would accelerate Ixia's growth prospects; and (3) acquiring niche businesses engaged in growth areas."[34]

### 1.    The First Restatement

On February 23, 2007, Ixia purportedly announced that it was restating its Form 10-K for 2003, 2004, and 2005, as well as Forms 10-Q for quarters ending March 31, 2006, June 30, 2006, and September 30, 2006 (the "first restatement").[35]  The restatement adjusted revenues, operating results, and deferred revenue because Ixia had recognized too much present revenue from software maintenance contracts into which it had entered and should have deferred a portion as required by applicable accounting rules.[36]  Ixia allegedly stated that the February 23, 2007 announcement was made to correct errors Ixia had made in applying AICPA Statement of Position 97-2, Software Revenue Recognition ("SOP 97-2").[37]  It cited section .08 of SOP 97-2, which allegedly provides clear rules for when revenue on software and maintenance contracts is supposed to be recognized.[38]  Plaintiffs contend that the first restatement alerted management to the need to pay close attention to revenue recognition on Ixia's software maintenance contracts.[39]

---

[34]*Id.*

[35]*Id.*, ¶ 29.

[36]*Id.*  See also Supplemental Declaration of Eric Rieder in Support of Defendants' Motion to Dismiss ("Supp. Reider Decl."), Docket No. 93 (Sept. 8, 2014), Exh. 33 at 10 (listing total revenues as initially reported and total revenues as restated).

[37]*Id.*, ¶ 30.

[38]*Id.* Section .08 of SOP 97-2 states that revenue should be recognized when the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred; (3) the vendor's fee is fixed or determinable; and (4) collectibility is probable.  (*Id.*)

[39]*Id.*, ¶ 205.

### 2.      Ixia's Focus on Future Growth Potential

Plaintiffs allege that Ixia began to focus on future growth potential after it strategically acquired two small businesses in 2009:[40] Catapult Communications, which designs, develops, manufactures, markets, and supports software-based test systems for the telecommunications industry, on June 23, 2009, and the N2X product line from Agilent Technologies for $44 million in cash on October 21, 2009.[41]  Price Target Research noted on June 6, 2010, that Ixia's growth rate forecast was 20% – "substantially above the average historical growth measures."[42]  It also observed, however, that Ixia's growth rate "ha[d] slowed very considerably in recent years."[43]

Plaintiffs cite numerous other 2010 analyst reports that focused on Ixia's potential for growth.[44] They note that Morgan Keegan & Co. reported that "Ixia's growth rates of 46% in 2010 (boosted by acquisitions) and 15% in 2011 compare[d] to its test & measurement end market growth rates of 18% and 21% in [Morgan Keegan's] estimates, . . . suggest[ing] that [the] estimates [were] conservative with room for upside."[45]  Wunderlich reported on October 22, 2010, that it was "increasing [its estimate of Ixia's] 3-5 year growth rate to 22% from 20%."[46]  Capstone analysts met with Ixia management in November 2010; it reported on November 11, 2010, that management "talked about . . . industry trends providing tailwinds for their product growth," and noted that Wall Street "estimates [were] currently for 16% and 12% [year over year] sales growth for 2011 and 2012."[47]  Finally, on November 23, 2010, Wunderlich reported that it believed "most of the upside of Ixia's recent results and guidance

---

[40]*Id.*, ¶ 47.

[41]*Id.*

[42]*Id.*, ¶ 48.

[43]*Id.*

[44]*Id.*, ¶ 49.

[45]*Id.*

[46]*Id.*

[47]*Id.*, ¶ 50.

represent[ed] the early stage of a demand cycle that [would] be lengthier and larger than what the company had previously experienced, because demand for data ha[d] multiplied . . . and [was] expanding into emerging markets." Wunderlich increased its 3-5 year net income growth rate forecast for Ixia from 22% to 28%.[48]

Plaintiffs allege that during the period in which Ixia was "building its story as a growth company," analysts were paying close attention to its deferred revenues, and in particular its ability to generate service-based or other types of renewable, recurring revenue.[49] They contend that investors often view deferred revenues as an indication of a company's future health and ability to grow. In particular, they cite a May 9, 2010 report by Wunderlich, which stated that it "expect[ed] continued strong software and service maintenance renewals,"[50] and a July 21, 2010 analyst report in which Wunderlich commented on Ixia's deferred revenues, stating: "Recent growth in deferred revenue adds visibility. Deferred revenue grew 10.5% sequentially in the March quarter, well ahead of the 2.4% sequential growth we forecast for both product and service revenue."[51] Plaintiffs also note Wunderlich's comment that "Ixia saw little of the service revenue that contributed over 30% of [Catapult's] sales when [it] was an independent company. Much of this was because of the elimination of deferred revenue through acquisition accounting. . . ." Wunderlich reported, however, that it "expect[ed] visibility for maintenance renewals to have improved."[52] Indeed, during a July 22, 2010 analyst conference call, a Wunderlich analyst asked whether Ixia expected the maintenance revenue Catapult had typically earned as an independent company to return. Miller responded that he believed it would, because the rate of renewal was essentially unchanged, and Ixia would be able to recognize 100% of the renewal revenue while it had been unable to recognize existing contract revenue due to post-acquisition

---

[48]*Id.*, ¶ 51.

[49]*Id.*, ¶ 52.

[50]*Id.*

[51]*Id.*, ¶ 53 (emphasis removed).

[52]*Id.*, ¶ 54 (emphasis removed).

accounting requirements.[53] Plaintiffs assert the analyst's question shows that the market was concerned that Ixia's revenues were too dependent on product-based revenues as opposed to renewable maintenance and service-based revenues.[54]

Wunderlich purportedly continued to focus on deferred revenue for the rest of 2010 and into 2011. During a February 3, 2011 analyst call, a Wunderlich analyst noted that Ixia had "good deferred revenue growth, along with activity decrease in [day sales outstanding]." In response, Miller commented that Ixia was a "very back-end loaded business." The next day, Wunderlich reported that Ixia's "deferred revenue grew the most in a year and [day sales outstanding] declined to the lowest level in more than a year." Specifically, it reported that deferred revenue was up 11.9% – "the strongest sequential comparison since the 4Q09 N2x acquisition."[55]

Plaintiffs contend that Deutsche Bank also "bought in" to Ixia's growth story; it observed in a February 3, 2011 report that although Ixia was trading at a premium as compared with its peers, the premium was "merited by [Ixia's] leadership position in the test equipment market and by the current network upgrade cycle."[56] Deutsche Bank also stated that Ixia continued to benefit from "several growth trends," including consolidation of data centers, a shift toward cloud-based computing, and growth in mobile data.[57]

### 3. Allegations of Fraudulently Inflated Deferred Revenue in Quarterly and Annual Reports

Plaintiffs contend that simply acquiring new businesses was not sufficient to permit Ixia to grow. They assert that at some point during 2010, Ixia began to inflate its deferred revenue fraudulently to convince investors of its capacity for sustained growth; they maintain it continued the practice

---

[53]*Id.*, ¶ 55.

[54]*Id.*

[55]*Id.*, ¶ 57 (emphasis removed).

[56]*Id.*, ¶ 58.

[57]*Id.*

throughout the class period.[58]  Plaintiffs contend that on April 3, 2013, Ixia announced that deferred revenue had been inflated throughout the class period, and that its Audit Committee had recommended that it restate previously issued financial statements ("the second restatement").[59]  Ixia's Form 10-K for 2010, which was filed February 3, 2011, is the earliest of Ixia's public statements that was restated.  In it, Ixia reported total revenue of $276.8 million, an increase of 56% from the prior year, and deferred revenue of $46.7 million for 2010.[60]  The restatement revealed that deferred revenue had been artificially inflated, and total revenue deflated.[61]  Plaintiffs allege that had Ixia properly accounted for deferred earnings, it would have reported an additional 14% increase in net income.  Although Ixia reported that the restatement "affect[ed] . . . deferred revenues," it did not state quantify the inflation of deferred revenue for 2010.[62]

On April 21, 2011, Ixia held an analyst call to announce earnings for the first quarter of 2011.[63]  It reported that revenue had exceeded expectations, growing to a record $78.5 million; in addition, it reported deferred revenue of $45.2 million.[64]  The second restatement allegedly later revealed that deferred revenue had been artificially inflated.[65]  Had correct revenue figures been used, Ixia's net income would purportedly have declined by $.472 million, from $7.1 million to $6.6 million.  Once again, Ixia's restatement did not quantify the amount by which deferred revenues for the first quarter of 2011 had been inflated.[66]

---

[58]*Id.*, ¶ 40.

[59]*Id.*, ¶¶ 8, 44.

[60]*Id.*, ¶¶ 59, 117.

[61]*Id.*, ¶ 60, 120.

[62]*Id.*, ¶ 121.

[63]*Id.*, ¶ 122.

[64]*Id.*

[65]*Id.*, ¶ 60.

[66]*Id.*, ¶ 126.

During the April 21 conference call, Ixia allegedly continued to encourage investors to view it as a growth company. Then-CEO Bhatnagar stated that Ixia was "excited about [its] market positioning, as well as the opportunities [it] [saw] for future growth and global expansion."[67] Deutsche Bank later highlighted the fact that Ixia "made a point to say [that it had] the ability to grow both organically and inorganically."[68] Capstone also focused on Ixia's growth, remarking that Ixia "may be growing faster than the market, as well as gaining additional revenue cross selling other products to its existing customers."[69] Plaintiffs allege that Ixia continued to promote its story of growth by acquiring VeriWave, a privately held wireless LAN testing equipment company, on June 27, 2011.[70]

On July 6, 2011, Ixia purportedly announced ahead of its earnings report that it anticipated that it would miss expectations for the second quarter of 2011.[71] Ixia's stock price fell 24% from a closing price of $13.01 on July 7, 2011, to $9.90 on July 8, 2011.[72] Capstone questioned whether this was merely a "road bump or [a] major detour" on July 8. Wunderlich noted in a report the same day that Ixia "[did] not benefit from the flywheel effect of a strong subscription revenue base," because "more than 80%" of its revenue came from product sales.[73] Plaintiffs assert these analyst comments increased the pressure on Ixia to paint a positive picture of its capacity to generate recurring revenue from subscription-based services like maintenance.[74] Thus, on July 21, 2011, after the close of trading, Ixia reported total second quarter 2011 revenue of $69 million, down from the prior quarter, and record deferred revenues of $49.9 million, up 10.3% from the first quarter of 2011, and 22.7% from the second

---

[67]*Id.*, ¶ 61.

[68]*Id.*, ¶ 62.

[69]*Id.*

[70]*Id.*, ¶ 63.

[71]*Id.*, ¶ 64.

[72]*Id.*, ¶ 127.

[73]*Id.*, ¶ 65.

[74]*Id.*

quarter 2010.[75] Ixia's stock price remained relatively unchanged after the substantial loss caused by the pre-announcement that it had missed its earnings guidance.[76] Plaintiffs allege that the deferred revenue reported was inflated, and was subsequently adjusted in the second restatement.[77] In particular, they assert that Ixia should have reported an increase in net income, and diluted earnings per share of $.02 instead of $.01.[78] The second restatement did not quantify the overstatement of deferred revenue; it simply noted that the restatement had "affect[ed] . . . deferred revenues."[79]

Miller and Bhatnagar also allegedly made statements that focused on deferred revenue during this period. During a conference call on July 21, 2011, Miller allegedly stated that there were deals Ixia hoped to pull out of deferred revenue in the next quarter; plaintiffs assert this statement served to reinforce investors' belief that deferred revenue was an indicator of the company's future success.[80] Bhatnagar said he believed there was more room for growth; he stated that wireless traffic was doubling and that, despite the potential for a "blip" here and there, Ixia was poised for "very solid growth" over the next three to four years.[81] Plaintiffs allege these statements were made in an attempt to convince investors that Ixia would have solid, sustainable, and overall smooth growth. Following the conference call, Deutsche Bank reported on July 22, 2011, that management had reassured investors that the company's business trends were intact and that the major technology transitions relevant to its core operations still had momentum. Plaintiffs assert Ixia's announcement of high deferred revenue assuaged analysts' concerns following the negative earnings announcement.[82] They note Wunderlich reported

[75]*Id.*, ¶¶ 67, 68, 128.

[76]*Id.*, ¶ 129.

[77]*Id.*, ¶¶ 67, 120.

[78]*Id.*, ¶ 131.

[79]*Id.*

[80]*Id.*, ¶ 68.

[81]*Id.*, ¶ 69.

[82]*Id., ¶¶* 69-70.

that the decline in revenue "was a function of . . . deferred revenue growth, which was up 22.7% [year over year] and 10.3% sequentially; this was well more than the $0.16 per share of earnings that was expected before the preannouncement" of a negative quarter.[83]

On October 20, 2011, Ixia held an analyst call to report third quarter 2011 earnings.[84] It stated that revenue had increased to $77.3 million, "at the higher end of [the] guidance," reflecting 9% year-over-year growth compared with the same quarter in 2010.[85] It also reported deferred revenue of $49.2 million – an 18% increase from the third quarter of 2010.[86] Wunderlich and Capstone greeted this information enthusiastically. Wunderlich reported that the "June quarter miss look[ed] like a hiccup instead of a heart attack," while Capstone stated that the"Q2 miss appear[ed] . . . to be short lived." [87] Plaintiffs allege that in reality, the company's deferred revenue was artificially inflated, as the second restatement later revealed.[88] Even after restating its financials, they charge, Ixia did not quantify the amount by it had overstated deferred revenue.[89]

Plaintiffs assert that the second restatement confirmed that Ixia's inflation of deferred revenue continued into the fourth quarter of 2011.[90] Ixia reported deferred revenue for that fourth quarter of $51.1 million – up 9.4% from the same quarter in 2010.[91] It also reported total revenue for fiscal 2011 of $308.4 million, an increase of 11%.[92] These revenues and the company's earnings per share exceeded

---

[83]*Id.*, ¶ 70.

[84]*Id.*, ¶ 73.

[85]*Id.*, ¶¶ 73, 132.

[86]*Id.*, ¶ 132.

[87]*Id.*, ¶ 74.

[88]*Id.*

[89]*Id.*, ¶ 135.

[90]*Id.*, ¶ 75.

[91]*Id.*, ¶ 136.

[92]*Id.*

guidance and analyst expectations.[93]  Ixia's stock rose 14% on this news, from a close of $12.74 on February 2, 2012, to a close of $14.55 on February 3, 2012.[94]  Plaintiffs contend, however, that once again, the numbers were artificially inflated and were later corrected in the second restatement.[95]  They maintain that deferred revenue for the fourth quarter should have been $43.02 million – 18.7% lower than the number reported.  They allege that defendants reported the high number to mislead investors and cause then to believe that Ixia was a growth company due at least in part to recurring revenue streams.[96]  Plaintiffs maintain that, properly reported, total net income for the fiscal year would have increased by $2.9 million, from $23.8 million to $26.7 million.[97]

On March 15, 2012, Ixia announced it was replacing Bhatnagar with Alston, effective May 1, 2012.[98]  Alston was allegedly instrumental in defining Ixia's strategy and identifying acquisitions; replacing Bhatnagar with Alston was purportedly intended to further enhance investor perceptions of Ixia as a growth company.[99]  Wunderlich expressed surprise, but noted that Ixia's board saw potential for "even speedier execution with Alston in charge."[100]

On April 19, 2012, Ixia announced total revenue of $85.6 million for the first quarter of 2012; it also reported deferred revenue of $57 million.[101]  Ixia's stock rose 9.1%, closing on April 19, 2012, at $11.21, and the following day at $12.23.[102]

---

[93]*Id.*, ¶ 75.

[94]*Id.*, ¶ 128.

[95]*Id.*, ¶ 75, 141.

[96]*Id.*, ¶ 142.

[97]*Id.*, ¶ 143.

[98]*Id.*, ¶ 76.

[99]*Id.*

[100]*Id.*, ¶ 77.

[101]*Id.*, ¶¶ 74, 144.

[102]*Id.*, ¶ 146.

Deutsche Bank noted that Ixia had beat analysts' consensus number of $83.5 million; Gabelli & Company, Inc. observed that the company's solid growth trend was expected to continue; and Wunderlich remarked on Ixia's "strong balance of deferred revenue [which could] diminish[ ] head-line risk for the current quarter."[103] Plaintiffs allege that Ixia's deferred revenue was inflated, as the second restatement later revealed that it should have been $47.9 million for the first quarter of 2012, 18% less than the $57 million initially reported. Net income should purportedly have been $5.2 million – an increase of 15.2%.[104] On May 2, 2012, Ixia allegedly filed a quarterly report with the SEC on Form 10-Q signed by Bhatnagar and Miller.[105] This report purportedly contained the same figures as the April 19, 2012 press release.[106]

Plaintiffs also allege that Ixia made two more acquisitions in 2012. On May 4, 2012, it announced that it acquired Anue Systems, Inc. for $154.4 million, while on July 2, 2012, it announced that it acquired BreakingPoint Systems.[107] Plaintiffs assert that while these acquisitions may have signaled to investors that Ixia wanted to grow, it was the deferred revenue it reported that provided "factual and quantifiable evidence" it could grow. Absent the reporting of inflated deferred revenue, plaintiffs contend, the acquisitions alone would not have convinced investors that Ixia was a growth company.[108]

Ixia purportedly continued to report inflated deferred revenue during the remainder of 2012. On July 26, 2012, it announced second quarter results. These included revenue of $92.3 million and deferred revenue of $62.5 million, up 9.8% from the prior quarter, and 25.3% over the same quarter in

---

[103]*Id.*, ¶¶ 83-85.

[104]*Id.*, ¶ 85, 148-49.

[105]*Id.*, ¶ 147.

[106]*Id.*

[107]*Id.*, ¶ 86.

[108]*Id.*

2011.[109] Plaintiffs assert that analysts were "generally pleased" with these results, commenting that the company's "[g]rowth [did] not appear to be slowing," that it had provided full year guidance for 2012 and 2013 that "reiterate[d] [its] belief in [its] growth prospects," and that management was "optimistic" about the company's growth trajectory for 2012.[110] The second restatement later revealed that deferred revenue had once again been inflated, however, and that it should have been $55.1 million or 13.4% lower.[111] Plaintiffs also assert that actual revenue was overstated, and that, had the correct revenue figure been used, the company's net income would have declined by $1.2 million.[112]

Ixia announced third quarter 2012 results on October 24, 2012. It reported revenue of $109.6 million, and record deferred revenue of $76.8 million – up 22.8% from the prior quarter, and 56% from the third quarter 2011.[113] Plaintiffs allege these figures were false and misleading because the second restatement later revealed that Ixia's deferred revenue was only $68.3 million, or 12.4% lower than the $76.8 million initially reported.[114] Additionally, net income would have declined by $0.5 million, from $11.4 million to $10.9 million had proper accounting been used.[115] On November 8, 2012, Ixia allegedly filed a quarterly report with the SEC on Form 10-Q,[116] which was purportedly signed by Alston and Miller.[117] Plaintiffs assert that this report contained the same figures as the October 24, 2012 press release.[118]

---

[109]*Id.*, ¶¶ 87, 151.

[110]*Id.*, ¶ 88.

[111]*Id.*, ¶ 89.

[112]*Id.*, ¶ 156.

[113]*Id.*, ¶ 157.

[114]*Id.*, ¶¶ 90, 157.

[115]*Id.*, ¶ 162.

[116]*Id.*, ¶ 159.

[117]*Id.*

[118]*Id.*

On February 6, 2013, Ixia announced yet another record breaking quarter. It reported that fourth quarter revenue was $124 million, up 48% from the same quarter in 2011.[119] Ixia noted that its "core businesses" had generated record revenue – up 12% from the prior year and 16% for the year.[120] It also reported deferred revenue of $74.8 million – up 46.5% from the fourth quarter 2011. Plaintiffs allege that the second restatement later revealed that this figure had been artificially inflated, although it did not provide the correct amount.[121]

### 4. Misstatements Concerning Internal Controls

Plaintiffs also allege that Ixia made misstatements concerning its internal controls. Specifically, they assert that Ixia made the following statement in each Form 10-Q that it filed during the restated periods:

> "There have not been any changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter . . . that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."[122]

Plaintiffs assert this statement was materially false and misleading because Ixia announced on April 3, 2013, as discussed in more detail *infra*, that there had been material weaknesses in its internal controls related to revenue recognition on software maintenance and warranty contracts.[123] They contend Ixia's 2010 and 2011 Forms 10-K were also false and misleading because they represented that management had concluded the company's internal controls over financial reporting were "effective as of December 31, 2010." On April 3, 2013, however, Ixia acknowledged that there were material weaknesses in its internal controls. It stated that "the Company [had] not maintain[ed] effective disclosure controls and procedures and internal control over financial reporting as of December 31, 2012 because of . . . material

---

[119] *Id.*, ¶ 96.

[120] *Id.*

[121] *Id.*, ¶ 97.

[122] *Id.*, ¶ 170.

[123] *Id.*, ¶ 173.

17

weaknesses related to the accuracy with which the Company had historically recognized revenues related to its warranty and software maintenance contracts and arrangements."[124]

Plaintiffs allege that each Form 10-Q issued during the restated periods was signed and certified under § 302 of the Sarbanes-Oxley Act of 2002 by either Bhatnagar or Alston, and that Alston, Miller, and Bhatnagar were responsible for establishing and maintaining disclosure controls and procedures, as well as internal controls over financial reporting.  They assert that, by signing the quarterly reports on Form 10-Q, each represented that the company's internal controls and procedures were adequate and that they had designed appropriate disclosure controls and procedures relative to financial reporting.[125]

### 5.    The Second Restatement

Plaintiffs contend the truth behind Ixia's "growth story" began to emerge on March 19, 2013, when Ixia announced that it had filed a Form 12b-25 with the SEC concerning its annual Form 10-K for the year ended December 31, 2012, and had to delay the filing of its annual report to "correct an error related to the manner in which [it] recognize[d] revenues for its warranty and software maintenance contracts."[126]  On April 3, 2013, Ixia's management recommended to the Board's Audit Committee that Ixia restate previously issued financial statements for the fiscal years ended December 31, 2011 and 2011, and fiscal quarters ended March 31, 2011, June 30, 2011, September 30, 2011, March 31, 2012, June 30, 2012, and September 30, 2012 (the "restated periods"), as the public could no longer rely on the statements.[127]  On April 8, 2013, Ixia issued a press release to this effect.[128]  It also acknowledged

---

[124]*Id.*

[125]*Id.*, ¶ 175.

[126]*Id.*, ¶ 98.

[127]*Id.*, ¶¶ 8, 99.

[128]*Id.*, ¶ 101 ("The errors that require the restatement of our previously issued financial statements relate to the manner in which the Company recognizes revenues related to its warranty and software maintenance contracts, including a previous implied warranty and software maintenance arrangement with one of the Company's customers. . . .  The changes in the Company's revenue recognition practices will generally result in a shift of revenues between accounting periods in our previously issued financial statements, and will not have any impact on the total revenues recognized over the life of a warranty and software maintenance contract or arrangement, although the timing of

that there had been material defects in its internal controls during the restated periods.[129] Plaintiffs assert the announcement and press release show that Ixia had violated Regulation S-X, Item 303.[130] This rule requires certain supplemental disclosures in quarterly and annual financial statements to help investors better understand a company's financial condition.[131] Plaintiffs contend that by inflating deferred revenue, Ixia failed to disclose the effect that its accounting for implied warranty and maintenance contracts had on its trends and liquidity; it also purportedly created the false impression that deferred revenue was in line with its book-to-bill ratios,[132] and that operating and liquidity risks in future quarters were insignificant.[133] Plaintiffs also allege that the inflated deferred revenue and deflated actual revenue reported violated several fundamental accounting principles.[134] They contend that Ixia's misstatements

the recognition of such revenues will generally commence earlier and end earlier than was reflected in our previously issued financial statement for the Restated Period").

[129]*Id.*, ¶ 102 ("Management has concluded and the Company expects to disclose in its 2012 Form 10-K that the Company did not maintain effective disclosure controls and procedures and internal control over financial reporting as of December 31, 2012 because of the identified material weaknesses related to the accuracy with  which the Company had historically recognized revenues related to its warranty and software maintenance contracts and arrangements. Specifically, the Company did not design a control to compute and assess the significance of the difference between its revenue recognition practices related to the Company's warranty and software maintenance contracts and the revenues that would have been recognized using the appropriate accounting principles generally accepted in the United States of America. The Company also did not design a control to review changes to its previous implied warranty and software maintenance arrangement with one of its customers to properly determine the impact of revenue recognition when the implied arrangement ceased to exist").

[130]*Id.*, ¶ 165.

[131]*Id.*

[132]A company's "book-to-bill ratio" is the ratio of orders received to units shipped and billed in a particular period. (*Id.*)  It is used by investors to assess the future revenue outlook.  A ratio of 1 or more implies that more orders were received than filled, which in turn indicates strong demand.  (*Id.*)

[133]*Id.*, ¶ 166.

[134]*Id.*, ¶ 167. These include: (i) the principle that financial reporting should provide information that is useful to present and potential future investors and creditors in making rational investment and credit decisions, FASB Statement of Concepts No. 1, ¶ 34; (ii) the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to the resources, FASB Statement of Concepts No. 1, ¶ 40; (iii) the principle that financial reporting should provide

19

"could not have been inadvertent errors, nor could they have been the result of confusing or gray-area accounting policies."[135] Rather, Ixia purportedly violated GAAP rules that are followed by all software companies that have "multiple element arrangements," i.e., contracts that include a service-based component, i.e., technical support, warranty, and software maintenance.[136]

Many of Ixia's product sales include up to one year of technical support, warranty, and software maintenance; customers can choose to extend the services annually or for multi-year periods thereafter.[137] Ixia recognized revenues on its products on a "straight-line basis" over the contractual or estimated period during which services were to be rendered. The second restatement made two corrections to Ixia's recognition of revenue on such arrangements. These were identified as corrections required due to (1) an accounting practice error; and (2) an implied arrangement error.[138] The accounting practice error involved the time at which Ixia recognized revenue from a new contract. In its original financial statements, Ixia failed to recognize revenue at the point at which it had evidence of a contract. This overstated deferred revenue on its balance sheet and understated revenue on its statement of operations. Plaintiffs allege that any competent accounting professional would have known that revenue should be recognized as soon as there is evidence of a contract, assuming other criteria for revenue recognition are met. As a result, they assert, the accounting practice error could not have been

---

information about how the management of an enterprise has discharged its responsibility to stockholders in using the enterprise resources entrusted to it, FASB Statement of Concepts No. 1, ¶ 50; (iv) the principle that financial reporting should provide information about an enterprise's financial performance during a period, including past performance, FASB Statement of Concepts No. 1, ¶ 42; (v) the principle that financial reporting should be reliable in the sense that it represents what it purports to represent, FASB Statement of Concepts No. 2, ¶¶ 58-59; and (vi) the principle of completeness, i.e., that nothing is omitted from public disclosures that may be necessary to insure that other public statements accurately represent underlying events and conditions, FASB Statement of Concepts No. 2, ¶ 79. (*Id*., ¶ 167.)

[135]*Id.*, ¶ 105.

[136]*Id.*, ¶¶ 105-06.

[137]*Id.*, ¶ 106.

[138]*Id.*

the product of inadvertence or mistake.[139]

The implied arrangement error concerned revenue generated by one of Ixia's largest customers, Cisco. The company initially recorded deferred implied warranty and software maintenance revenue using estimated amounts and estimated times of receipt.[140] When it entered into an actual contract with Cisco, it should purportedly have adjusted these amounts based on the terms of the contract. Plaintiffs allege that, had Ixia made such an adjustment, it would immediately have reduced deferred revenue on its balance sheet and recognized additional revenue on its statement of operations.[141] As with the accounting practice error, plaintiffs assert the governing accounting principles are straightforward and that any competent accounting professional with experience in the software industry would have used the correct methodology.[142]

In response to the company's announcement of the second restatement, Ixia's share price dropped by 9.55%, from a closing price of $20.31 on April 3, 2013, to a closing price of $18.37 on April 4, 2013.[143]

On May 3, 2013, following announcement of the second restatement, Ixia reported that its auditor, PricewaterhouseCoopers LLP ("PwC") had "decline[d] to stand for re-appointment as [Ixia's] independent registered public accounting firm for the fiscal year ending December 31, 2013."[144]

On October 24, 2013, Ixia announced that Alston had resigned as CEO following a finding by the Audit Committee that he had misrepresented his academic credentials, his age, and early employment history.[145] Plaintiffs assert the fact that Alston lied about his education and employment

---

[139]*Id.*, ¶ 107.

[140]*Id.*, ¶ 108.

[141]*Id.*

[142]*Id.*

[143]*Id.*, ¶ 10.

[144]*Id.*, ¶ 11.

[145]*Id.*, ¶¶ 12, 45.

history shows that he was willing to "take unscrupulous measures" to further his goals, including portraying Ixia as a growth company. They contend that Ixia's decision to terminate Alston based on purported misrepresentations that had occurred ten years earlier, rather than for fraud, was no more than a "feeble, superficial attempt" to conceal the fact that he had been involved in the fraudulent scheme that necessitated the second restatement.[146]

### 6. The Third Restatement

On March 5, 2014, Ixia announced in a Form 8-K filed with the SEC that its Audit Committee had completed an internal investigation and that certain of its financial statements would have to be restated as a result of the investigation.[147] On April 11, 2014, Ixia announced the results of the investigation, and described the forthcoming third restatement as follows:

"[T]he Company's management and the Audit Committee concluded that the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013 and June 30, 2013 should no longer be relied upon, and should be restated due to the following errors:

For certain sales transactions, . . . [Ixia] improperly recognized product revenues when the additional products were shipped rather than deferring a portion of the consideration and recognizing the related revenues over the remaining term of the applicable fixed fee, multi-year extended maintenance and warranty arrangements.

For certain other sales transactions, the Company recognized product revenues prematurely (i) in advance of delivering certain product functionality or other deliverables that were committed to be provided to the customers or (ii) due to an incorrect assessment of certain multiple-element arrangement sales transactions which included professional services that were provided based on a purchase order separate from the product purchase order but that were negotiated concurrently with the customer.

. . .

[146]*Id.*

[147]*Id.*, ¶ 109.

The correction of these errors is expected to reduce total revenues by approximately $2.0 million and $4.5 million for the quarters ended March 31, 2013 and June 30, 2013, respectively."[148]

Plaintiffs assert that the third restatement "sheds further light" on defendants' fraudulent scheme to inflate deferred revenue and create the illusion that Ixia was a growth company.[149] They contend that during periods of accelerating revenue growth, Ixia "managed" the growth by improperly deferring revenue and moving it into future periods.[150] The revenue growth was purportedly driven, in large part, by Ixia's acquisition of new companies. Plaintiffs assert that had revenue from the acquired companies been removed, and only Ixia's "organic revenue" been considered, revenue would have begun to decline, year over year, in the third quarter of 2012.[151] This revenue slide allegedly turned negative during the first two quarters of 2013.[152] Plaintiffs assert that, "to mask this decline," Ixia recognized more revenue than it should have during the first two quarters of 2013.[153] It was able to do this, they contend, because it had inflated deferred revenue in prior quarters. Thus, it was able to draw on the revenue it had deferred to inflate revenue for the first two quarters of 2013.[154]

The third restatement reflected that the decline in year-over-year and quarter-over-quarter organic revenue was steeper than originally reported. Revenue for the first quarter of 2013 was 13.1% lower than for the fourth quarter 2012; revenue for the second quarter of 2013 was 5.2% lower than for the first quarter of 2013.[155] Year-over-year results showed a similar decline of 5% for the first quarter

[148]*Id.*, ¶ 110

[149]*Id.*, ¶ 111.

[150]*Id.*

[151]*Id.*, ¶ 112.

[152]*Id.*, ¶ 113.

[153]*Id.*, ¶ 115.

[154]*Id.*, ¶¶ 113-114.

[155]*Id.*, ¶ 116.

23

of 2013 and 9.9% for the second quarter of 2013.[156]

### 7. Insider Trading

Plaintiffs also allege that the individual defendants engaged in insider trading.[157] Specifically, they assert that on March 6, 2013, less than two weeks before the second restatement was issued, Alston sold 45,754 shares of Ixia common stock at approximately $21.50 per share, netting almost $1 million.[158] Plaintiffs contend that Alston "had no discernible usual trading practices," and that "these trades were unusual for him," given that they represented 22% of his Ixia shares at the time. Plaintiffs assert the fact that he "unloaded" so many shares of stock just prior to announcement of the second restatement is indicative of scienter. They contend that prior to the class period, Alston had sold less than 3% of his holdings; however, just before the second restatement was announced, he sold more than 22% of his holdings.[159] Moreover, Alston's actual holdings decreased by more than 70% during the class period.[160] Plaintiffs allege that Alston realized a large gain from the stock sales he made and the options he exercised at the start of the class period; in February and March 2011, he sold 85,690 shares for proceeds of almost $1.43 million.[161] Other than these sales, plaintiffs contend, Alston never sold more than 2,000 shares in any given month. They contend that this too is indicative of scienter.[162]

Plaintiffs allege that Ginsberg also profited from suspicious trades he made in May 2011 and February 2013.[163] Plaintiffs contend the trades were suspicious because they occurred just five weeks

---

[156]*Id.*

[157]*Id.*, ¶¶ 177-203.

[158]*Id.*, ¶¶ 178-181.

[159]*Id.*, ¶ 184.

[160]*Id.*, ¶ 181.

[161]*Id.*, ¶ 182.

[162]*Id.*, ¶ 183.

[163]*Id.*, ¶ 188.

24

before announcement of the second restatement.[164]  Specifically, they assert that Ginsberg was able to capitalize on Ixia's strong April 21, 2011 earnings report, which inflated deferred revenue and drove up Ixia's share price by nearly 5%.  Between May 3 and May 6, 2011, Ginsberg sold 28.75% of his shares, netting more than $1.9 million.  In addition to capitalizing on the strong April 21, 2011 earnings report, Ginsberg avoided losses from the 24% share price drop that followed the company's announcement of disappointing second quarter 2011 results on July 7, 2011.[165]  Plaintiffs contend that the trades were "highly unusual" for Ginsberg, and that they were his only sales during the class period.[166]

Finally, plaintiffs allege that Miller, too, engaged in suspicious trading.  They contend that between February 8 and March 5, 2013, Miller sold 15.4% of his holdings for $722,457.[167]  They note that he sold more than 122,309 shares between February 7 and February 18, 2011, just prior to the start of the class period, netting $1.97 million.[168]  Plaintiffs further allege that during the class period, Miller's actual holdings of the stock decreased almost 60%.[169]  They maintain that these trades differed significantly from those before the class period.[170]

Plaintiffs assert that, like Ginsberg, Miller avoided the losses associated with Ixia's July 7, 2011 announcement that it would not meet its guidance for the second quarter of 2011, selling 50,741 shares, or 36.75% of his holdings, between April 27 and May 16, 2011.[171]  Finally, they contend that two months prior to announcement of the second restatement, on February 7 and March 5, 2013, he sold

---

[164]*Id.*, ¶ 190.

[165]*Id.*, ¶ 191.

[166]*Id.*, ¶ 192.

[167]*Id.*, ¶ 197.

[168]*Id.*, ¶ 198.

[169]*Id.*, ¶ 199.

[170]*Id.*, ¶ 201.

[171]*Id.*, ¶¶ 191, 201.

34,741 shares – or 25% of his holdings, netting $722,400.[172]  Miller purportedly did not sell more than 50,000 shares in any given month prior to the class period, making the sales suspicious.[173]  Plaintiffs also allege that Miller's sales cannot be explained by an increase in holdings during the class period, because he held a similar amount of shares in the pre-class period as he did in the class period.[174]

Plaintiffs contend that the sales made by Alston, Ginsberg, and Miller coincided with some of the peak prices of Ixia's stock, and that they were made shortly before precipitous stock price declines.[175]

### 8.    The Confidential Witnesses ("CWs")

Plaintiffs allege that they interviewed certain confidential witnesses ("CWs") to gather information concerning the purported fraud.  CW1 worked at Ixia's corporate headquarters in Calabasas from September 2007 to January 2014 as the company's international finance manager.[176]  CW1 was responsible for the company's international financial reporting.[177]  CW2 began working at Ixia in 1998 as an office manager, later becoming a sales administrator, and director of inside sales.[178]  In 2006, CW2 was promoted to senior business systems analyst and reported to the senior director of quality, Mike Glish, who in turn reported to the vice president of operations, Raymond de Graaf.  CW3 worked at Ixia as Corporate Controller from April 2007 to August 2013 and was based at the California headquarters throughout that period.  CW3 reported directly to Miller.  CW1 reported to CW3.[179]

CW1 allegedly reported that Ixia hired an expert in recognizing revenue derived from software

---

[172]*Id.*, ¶ 197.

[173]*Id.*, ¶ 201.

[174]*Id.*, ¶ 202.

[175]*Id.*, ¶ 203.

[176]*Id.*, ¶ 212.

[177]*Id.*

[178]*Id.*, ¶ 213.

[179]*Id.*, ¶ 214.

26

and maintenance contracts, Will Liang; Liang was ultimately appointed director of accounting.[180] CW1 also purportedly stated that "everyone above Will Liang" would "have been involved in any decision about how to recognize revenue relating to Ixia's software and maintenance contracts."[181] Plaintiffs contend that CW2 "confirmed" Will Liang's retention as "director of revenue recognition" in 2007.[182] CW3 purportedly stated that he and Liang participated in meetings with Ixia's CEO and CFO throughout CW3's tenure at Ixia.[183] Plaintiffs allege that it was a regular practice at these meetings to discuss how revenue should be recognized for warranty and maintenance contracts.[184]

### 9.   The Class Period

Plaintiffs seek to represent a class of persons, except defendants and their affiliates, who purchased Ixia common stock between February 4, 2011 and April 3, 2013, inclusive.[185] This includes the periods during which the first and second restatements were announced, but not the third restatement.

## II.  DISCUSSION

### A.   Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*,

---

[180]*Id.*, ¶ 215.

[181]*Id.*

[182]*Id.*, ¶ 216.

[183]*Id.*, ¶ 217.

[184]*Id.*, ¶ 218.

[185]*Id.*, ¶ 1.

284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"); see also *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995). The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

**B.    Ixia's Request For Judicial Notice**

Ixia asks that the court take judicial notice of various documents.[186] Because Rule 12(b)(6) review is confined to the complaint, the court typically does not consider material outside the pleadings (e.g., facts presented in briefs, affidavits, or discovery materials) in deciding such a motion. *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996). It may, however, properly consider exhibits attached to the complaint and documents whose contents

---

[186]Ixia's Request for Judicial Notice ("RJN"), Docket No. 105 (Jan. 6, 2015).

are alleged in the complaint but not attached, if their authenticity is not questioned. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).

Exhibits 1-2, 4-13, 16-34, and 39 to Ixia's request for judicial notice are referenced in the second amended complaint, and are thus incorporated by reference; as a result, the court can consider them in deciding defendants' motions to dismiss under the "incorporation by reference" doctrine. *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1405 n. 4 (9th Cir. 1996) (discussing securities offering documents); see also *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint), abrogated on other grounds as recognized in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *In re Copper Mountain Sec. Litig.*, 311 F.Supp.2d 857, 864 (N.D. Cal. 2004) (taking judicial notice of an analyst report referenced in the complaint); *In re Northpoint Communications Group, Inc. Securities Litigation*, 184 F.Supp.2d 991, 994 n. 1 (N.D. Cal. 2001) ("In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure" (citations omitted)).

Plaintiffs object to Ixia's request for judicial notice; they assert the court cannot rely on Exhibits 1, 6, 13, and 25-28 to contradict the allegations in the complaint.[187] Plaintiffs make the same objection with respect to Exhibits 4-5, 7-12, 16-24, and 39. The objection lacks merit. Where a document has been incorporated by reference in a complaint, a court "'may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (citation omitted). Further, a court can consider the entire document, not simply the portion on which plaintiffs rely. See *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n. 10 (9th Cir. 2014) ("Because Plaintiffs incorporate by reference Mr. Hunt's declaration, relying on portions of it in their complaint, we may

_____

[187]Plaintiffs' Objection to Ixia's Request for Judicial Notice, Docket No. 110 (Feb. 10, 2015).

properly consider the declaration in its entirety"). Plaintiffs do not contend that the exhibits are not authentic or otherwise unreliable. They therefore cannot object to consideration of them, as they incorporated the documents by reference in the second amended complaint.

Exhibits 35-38, which are Forms 4 filed with the SEC by Alston, Miller, Ginsberg, and Bhatnagar, are not expressly referenced in the complaint. The court can nonetheless consider them under the doctrine of incorporation by reference because they are related to plaintiffs' allegations concerning stock sales by the individual defendants. See *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint"); *Silicon Graphics*, 183 F.3d at 986 (treating Forms 4 as incorporated by reference where plaintiff "clearly gleaned from the SEC Form 3 and 4 filings many of the facts regarding the officers' stock sales"); *In re InfoSonics Corp. Sec. Litig.*, No. 06-CV-1231 BTM WMC, 2007 WL 2301757, *5 (S.D. Cal. Aug. 7, 2007) ("The Court takes judicial notice of the Forms 4 and considers them under the incorporation by reference doctrine. Plaintiffs discuss Defendants' stock trades and must have relied on the SEC filings"); *In re Tibco Software, Inc.*, No. CV 05-2146 SBA, 2006 WL 1469654, *17 (N.D. Cal. May 25, 2006) (holding that Forms 4 were "deemed incorporated by reference into a complaint when a plaintiff's allegations rely on a defendant's stock sales").

In addition, the court can consider matters that are proper subjects of judicial notice under Rule 201 of the Federal Rules of Evidence. *Lee*, 250 F.3d at 688-89; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds in *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Hal Roach Studios, Inc.*, 896 F.2d at 1555 n. 19; see also *Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice").[188]

Exhibits 3, 14, 15, and 35-38 are not referenced in the complaint.  Exhibit 3 is Ixia's 2009 Form 10-K.  Courts can take judicial notice of securities offerings and corporate disclosure documents that are publicly available.  See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings.  In its dismissal order, the court granted Defendants' unopposed requests for judicial notice.  Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper"); *Dreiling v. Am. Express Co.*, 458 F. 3d 942, 946 n. 2 (9th Cir. 2006) (court may consider "any matter subject to judicial notice, such as SEC filings"); *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (taking judicial notice of SEC forms and press releases that were "clearly, if indirectly, referenced in the Complaint as integral to the stock sale allegations made in the Complaint"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1158 (C.D. Cal. 2007) ("[T]he Court may properly take judicial notice of the SEC filings as public records of undisputed authenticity").

Plaintiffs contend the court should not consider Exhibit 3 because defendants use it only to contravene allegations in the second amended complaint.  Defendants maintain that they offer the exhibit only to identify the amount of revenue, earnings, and total liabilities Ixia originally reported for fiscal year 2009, which will demonstrate the second restatement's impact on the relevant financial metrics.  The court is permitted to take judicial notice of the content of SEC filings, but the truth of that content is not a proper subject of judicial notice.  See *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC.  Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents," citing *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354–55 (7th

---

[188]Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment.  *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

Cir. 1995) (holding that the district court properly declined to take judicial notice of a corporation's Form 10-K to determine a fact in dispute – the number of corporate employees)); *In re Foundry Networks, Inc.*, CV 00–4823 MMC, 2003 WL 23211577, \*10 n. 11 (N.D. Cal. Feb. 14, 2003) ("Defendants have filed a Request for Judicial Notice, wherein they seek judicial notice of (1) two Foundry press releases, (2) SEC Forms 4 filed by Foundry's officers, and (3) Foundry's SEC Forms 10-K and 10-Q filings. Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"). Therefore, the court will take judicial notice of Exhibit 3, but only of the content of the document and the fact of its filing.

Exhibits 14 and 15 are Forms 8-K dated April 11, 2008 and January 7, 2009 respectively. The documents are relevant to defendants' contention that plaintiffs' fraud theory is not plausible as well as plaintiffs' scienter allegations based on suspicious trading activity. Plaintiffs object to consideration of Exhibits 2, 3, 6, 14, and 15 on relevance grounds and because they are offered to induce the court impermissibly to infer that plaintiffs' fraud theory is not plausible. Again, the court will take judicial notice only of the content and existence of these SEC filings, not their truth. See *Lovelace*, 78 F.3d at 1018 ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents"); *Hennessy*, 69 F.3d at 1354-55 (holding that the district court properly refused to take judicial notice of a corporation's Form 10-K to determine a fact in dispute).

Ixia also proffers three appendices to its request for judicial notice, Appendices A-C, that summarize the trading activity of the individual defendants during and just prior to the class period. Plaintiffs argue that the summaries, which are spreadsheets and tabulations created by defendants, are not proper subjects of judicial notice and should be disregarded. Rule 1006 of the Federal Rules of Evidence provides that a party submitting "voluminous" data to a court may present that data "in the form of a chart, summary, or calculation," so long as the originals or duplicates of the originals are made

available for inspection. FED.R.EVID. 1006; cf. *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 881-84 (S.D. Tex. 2001) ("Under Fed.R.Evid. 1006, [a] summary chart [of information contained in SEC filings] may be included because the underlying documents are also submitted for consideration by the Court and thus not hearsay"). "Because [defendants have submitted] the underlying documents . . . for consideration, the [court declines to disregard the] summaries, tables and charts . . . , [but] will not . . . consider[ ] [them] without reference to underlying documents," all of which were incorporated by reference in the complaint. See *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 134 (D. Conn. 2007) (relying on charts and summaries involving insider stock sales), aff'd, 312 Fed. Appx. 400 (2d Cir. Feb. 26, 2009) (Unpub. Disp.); see also *Amsted Indus. Inc. v. Nat'l Castings, Inc.*, No. 88 CV 924, 1990 WL 106548, \*22 (N.D. Ill. July 11, 1990) ("Thus, charts and graphs summarizing data culled from the financial records of the parties have often been admitted in the recognition that such summaries are a reasonable and efficient means of presenting the relevant information"). Here, the appendices clearly identify the documents from which the underlying data is derived; they are based exclusively on Forms 4 and Definitive Proxy Statements on Schedule 14A. As noted above, all of these documents are incorporated by reference in the complaint.[189] The court will therefore consider the appendices, but only with reference to the underlying Forms 4 and proxy statements on which they are based.

Ixia's request for judicial notice is therefore granted in full, subject to the limitations noted above.

**C.    Legal Standard Governing the Pleading of Securities Fraud Claims**

Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.PROC. 9(b). A securities fraud claim cannot survive a motion to dismiss under Rule 9(b) merely by alleging that certain statements were false. *Metzler*, 540 F.3d at 1070 ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet th[e Rule 9(b)] standard"); see also *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 390 (9th Cir. 2010)

---

[189]See RJN, Exhs. 29-34 (Definitive Proxy Statement on Schedule 14A), Exhs. 35-38 (Alston, Ginsberg, Miller, and Bhatnagar's Forms 4).

("Plaintiffs must 'demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression,' quoting *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 512 (9th Cir. 1991)). Rather, the complaint must allege "why the disputed statement was untrue or misleading *when made.*" *In re Glenfed Inc. Securities Litigation*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc) (emphasis added).

In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which amended the Securities Exchange Act of 1934. The PSLRA modified Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see *Silicon Graphics*, 183 F.3d at 996. With respect to pleading that each allegedly misleading statement or omission was made with scienter, the statute requires that the plaintiff "state with particularity . . . facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u- 4(b)(3)(A).[190]

In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5.'" *Tellabs*, 551 U.S. at 320 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). The PSLRA's requirements "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061 (citing *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002)).

---

[190]The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without actual knowledge of their falsity. 15 U.S.C. §§ 77z-2(c), 78u-5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z-2(i), 78u-5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v. Haggerty*, 38 F.Supp.2d 816, 830 (C.D. Cal. 1998).

**D.      Legal Standard Governing Liability Under Section 10(b) and Rule 10b-5**

Rule 10b-5, promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically, one cannot "(a) . . . employ any device, scheme, or artifice to defraud; (b) . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The elements of a section 10(b) or Rule 10b-5 violation are: (1) a misrepresentation or omission of a material fact, (2) scienter, (3) reliance (4) a connection with the purchase or sale of a security, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005); see also *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) (en banc); *McCormick v. Fund American Companies, Inc.*, 26 F.3d 869, 875 (9th Cir. 1994).

As noted, the complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). In addition to pleading falsity adequately, the pleading must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(2). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, . . . the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir. 2011) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991–92 (9th Cir. 2009)).

The Ninth Circuit has also emphasized that "plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.'" *Middlesex*

*Retirement System v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1179 (C.D. Cal. 2007) (quoting *Silicon Graphics*, 183 F.3d at 974); see also *Silicon Graphics*, 183 F.3d at 977 ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct"). The requisite state of mind must be a "'departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Zucco Partners*, 552 F.3d at 991 (quoting *Silicon Graphics*, 183 F.3d at 984). If plaintiffs rely on allegations of recklessness, the pleading standard requires that they "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979. Allegations of mere negligence are insufficient. *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("At most, it creates the inference that he *should have known* of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.*, No. 10–CV–03451–LHK, 2011 WL 3501733, *7 (N.D. Cal. Aug. 10, 2011) ("[T]he Ninth Circuit defines 'recklessness' as a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it").

"To qualify as 'strong' within the intendment of . . . the PSLRA . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Tellabs*, 551 U.S. at 314 (emphasis added). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . . The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis original).[191]

---

[191]Although neither party raises the issue, the court notes that *New Mexico State Investment Counsel* and *Zucco* could arguably be seen as inconsistent with *Tellabs* and *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011). In *Matrixx*, relying on its earlier decision in *Tellabs*, the Court reviewed the facts collectively, rather than parsing individual allegations. See *id*. at 1324 ("In making this determination, the court must review 'all the allegations holistically,'" citing *Tellabs*, 551 U.S. at

In determining whether plaintiffs have alleged facts showing a strong inference of scienter, the court must draw all reasonable inferences from the allegations presented, including inferences unfavorable to plaintiffs. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible[,]" [however] – it must be cogent and compelling . . . in light of other explanations.'" *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Tellabs*, 551 U.S. at 314).

The second amended complaint relies, to some extent, on the statements of confidential witnesses. Before those witnesses' statements can support a strong inference of scienter, they must meet two requirements. First, "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995; see also *In re Siebel Systems, Inc. Sec. Litig.*, No.

326); see also *Tellabs*, 551 U.S. at 326 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). In *Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011), the Sixth Circuit interpreted *Matrixx* as holding that collective consideration of scienter allegations was the "only appropriate approach." See *id.* at 961 ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency").

*Zucco*, a post-*Tellabs* Ninth Circuit case specifically noted the Supreme Court's instruction that courts view plaintiffs' allegations of scienter holistically, but stated that consideration of individual allegations of scienter was still pertinent when comparing whether the inference of knowledge or recklessness plaintiffs seek to draw is at least as compelling as the competing inference. See *Zucco*, 552 F.3d at 991-92 ("[W]e recognize that *Tellabs* calls into question a methodology that relies exclusively on a segmented analysis of scienter. We read *Tellabs* to mean that our prior, segmented approach is not sufficient to dismiss an allegation of scienter. Although we have continued to employ the old standards in determining whether a plaintiff's allegations of scienter are as cogent or as compelling as an opposing innocent inference, we must also view the allegations as a whole"). The Ninth Circuit's directives in *Zucco* and *New Mexico State Investment Council* bind the court. As noted, neither party objects to this approach; given that the two-step analysis dictated by the Ninth Circuit explicitly incorporates a holistic review of the facts, neither party will be prejudiced by the court's examination of individual allegations. In fact, the two-step analysis is designed to guard against the very problem with which *Tellabs* was concerned, i.e., that a court will examine each allegation in isolation without considering them in totality. Accordingly, the court addresses individual scienter allegations before holistically assessing the totality of the information in the complaint.

04-0983, 2005 WL 3555718,*8-9 (N.D. Cal. Dec. 28, 2005) (allegations attributed to a confidential witness "'must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge,'" quoting *In re Metawave Communications Corp.*, 298 F.Supp.2d 1056, 1068 (W.D. Wash. 2003)). Second, the information "reported by confidential witnesses with sufficient reliability and personal knowledge must [itself] be indicative of scienter." *Zucco Partners*, 552 F.3d at 995.

The Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re New Century*, 588 F.Supp.2d 1206, 1227 (C.D. Cal. 2008) (citing *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), abrogated by *Tellabs* on other grounds as recognized in *South Ferry LP, No. 2,*, 542 F.3d 776, and *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)). The court therefore analyzes plaintiffs' falsity and scienter allegations in tandem below.

**E.      Whether Plaintiffs Have Adequately Alleged Scienter**

**1.      Whether Plaintiffs' Fraud Theory is Plausible**

Defendants argue that plaintiffs fail to supply a "cogent fraud theory," which requires that their complaint be dismissed.[192] The cases they cite, *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011), and *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), do not support the proposition that a fraud "theory" must be "cogent," however. In *WPP*, the Ninth Circuit dismissed a Rule 10b-5 insider trading claim because plaintiff failed "to allege a cogent *scienter* theory" to explain why the defendant corporation engaged in allegedly fraudulent conduct that was at "odds with [its] financial interest." See 655 F.3d at 1056-57 (emphasis added). Thus, *WPP* holds that scienter allegations must be cogent, as required by the PSLRA. In *Kalnit*, the Second Circuit relied on prior circuit authority holding that where a "plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent." See 264 F.3d at 140-41 (alterations original; internal citations and quotation marks omitted). See also *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the

---

[192]Combined Motion at 5-8.

defendant is acting in his or her informed economic self-interest"). *Kalnit* does not employ the word "cogent," and refers to "fraudulent intent" as opposed to an overarching theory of fraud.

As plaintiffs argue, they need only supply a fraud theory that conforms to the pleading requirements of Rule 8 and Rule 9(b). The fraud theory, therefore, need only be plausible. See *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (Alito, J.) (stating, in Rule 10b-5 case, that "[p]laintiffs must accompany their legal theory with factual allegations that make their *theoretically viable claim plausible*" (emphasis added)); *Hart v. Internet Wire, Inc.*, 145 F.Supp.2d 360, 367 (S.D.N.Y. 2001) (citing *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 643 (N.D. Tex. 1999) (dismissing a 10b-5 complaint where, among other things, the "alleged motive to commit fraud is not plausible as pleaded")).

As the court noted in its order dismissing the first amended complaint, plaintiffs' theory of fraud rests on intentional overstatement of deferred revenue to portray the image that Ixia was a growth company. Plaintiffs contend that Ixia intentionally understated current revenue in order to overstate deferred revenue. Stated differently, they assert that Ixia shifted revenue from the present to the future; all revenue was reported, but was attributed to an incorrect period.[193] This was done, plaintiffs allege, to create the false impression that Ixia had significant future growth potential as a result of its service and warranty subscriptions.[194] The court found that plaintiffs' theory was a potentially plausible one, and found that it could not dismiss the first amended complaint without first addressing plaintiffs' scienter allegations.[195]

In their current motion, defendants do not dispute that "such a scheme might be potentially

[193]Order at 41.

[194]*Id.*

[195]The court noted that certain SEC enforcement proceedings have involved overstatement of deferred revenues. See *SEC Files Settled Enforcement Action Against Veritas Software Corporation*, SEC Release No. 2562, 2007 WL 528458, *1 (Feb. 21, 2007) ("Veritas engaged in three improper accounting practices to manage its earnings and artificially smooth its financial results. Specifically, Veritas improperly (a) recorded and maintained excess accrued liabilities, employing 'accrual wish lists' and 'cushion schedules'; (b) stopped recognizing professional service revenue it had fully delivered and earned upon reaching internal targets; and (c) inflated its deferred revenue balance").

plausible in rare circumstances."  They maintain, however, that the scheme alleged in the second amended complaint is not plausible because it: (1) is contradictory and internally inconsistent; (2) fails to allege facts from which the court can reasonably infer that defendants viewed growth in deferred revenue as preferable to growth in actual revenue or as an indicator of overall growth; and (iii) rests on an improbable premise.[196]

### a.     Contradictions and Inconsistencies

Defendants argue primarily that plaintiffs' deferred revenue overstatement theory is nonsensical to the extent it alleges Ixia was motivated by a desire to engage in  revenue smoothing.[197]  Defendants contend that the allegations of the complaint belie any plausible inference of revenue smoothing, because the alleged overstatement scheme began at a time when Ixia was losing money according to publicly filed documents.  Defendants thus maintain that Ixia had no excess cash to "pad" its deferred revenue, and hence no reason to overstate deferred revenue intentionally.[198]

Plaintiffs allege that the purported scheme began in 2010 when Ixia "began to artificially inflate its deferred revenue[ ]."[199]  Defendants maintain this allegation is contradicted by Ixia's 2012 Form 10-K, which states that the accounting error corrected by the second restatement resulted in "increased net income by approximately $2.9 million, $1.6 million, $3.0 million, and $260,000" for the fiscal years

---

[196]Combined Motion at 6.

[197]As the court noted in its prior order dismissing the first amended complaint, *S.E.C. v. Stanard*, No. 06 CIV 7736(GEL), 2009 WL 196023, *19 (S.D.N.Y. Jan. 27, 2009), provides an example of a revenue smoothing scheme.  In that case, the CEO of RenaissanceRe Holdings, Ltd. ("RenRe"), James Stanard, was involved in a scheme to "smooth earnings" or defer income.  The court acknowledged that "[l]ike any CEO, Stanard wanted RenRe's books to show smooth earnings growth over time. . . .  Stanard was frustrated, however, by accounting rules that, to his mind, impeded RenRe from showing in its financial statements what he believed was 'a better reflection of the long-run economics of the business' than GAAP permit[ted]." *Id*. *Stanard* makes clear that understatement theories can be potentially plausible to the extent based on smoothing.

[198]Combined Motion at 6-7; see also BGM Motion at 5-7.

[199]SAC, ¶ 40.

ended December 31, 2011, 2010, 2009, and 2008, respectively.[200] Because after the restatement, 2008 and 2009 revenue increased in addition to 2010 and 2011 revenue, defendants contend the incorrect deferral of revenue must have begun at least as early as 2008. The court agrees. Ixia initially reported total revenue of $175,867,000, a net loss of $15,895,000, and total liabilities (including deferred revenue) of $55,230,000 for 2008.[201] When it restated 2008 revenue in the second restatement, total revenue grew to $176,457,000, the net loss shrunk to $15,535,000, and total liabilities decreased to $54,640,000.[202] The same is true for 2009. As Ixia's 2012 Form 10-K makes clear, the second restatement "increased net income by approximately . . . $3.0 million" in 2009.[203]

That Ixia must have begun understating present revenue and overstating deferred revenue at least as early as 2008 is significant. Plaintiffs concede that inflating deferred revenue leads to lower revenue and earnings, but contend that as long as Ixia was exceeding its earnings and revenue guidance, it could allocate any excess revenue to deferred revenue without damaging the company's share price.[204] They assert that one reason Ixia was able to inflate deferred revenue without harming its share price was that "Ixia had been able to exceed its own guidance and analyst expectations for each quarter during the [c]lass [p]eriod . . . [such that it] had cash to spare, which it . . . allocat[ed] throughout the [c]lass [p]eriod to deferred revenue[ ] to bolster its image as a growth company."[205] Ixia's SEC filings render implausible any allegation that it began

 to defer revenue in 2008 because it had met its guidance and analyst expectations. In fact, Ixia lost

---

[200]Declaration of Eric Rieder ("Rieder Decl."), Docket No. 106 (Jan. 6, 2015), Exh. 6 (Ixia's 2012 Form 10-K) at 43.

[201]*Id*., Exh. 2 (Ixia's 2008 Form 10-K) at 54-55.

[202]*Id*., Exh. 6 (Ixia's 2012 Form 10-K) at 43-45.

[203]*Id*. at 43.

[204]SAC, ¶¶ 1, 3-4, 39-40, 43-44, 127.

[205]*Id*., ¶ 44 ("Although inflating deferred revenues had the effect of artificially depressing revenues for each quarter, as well as earnings per share for most of the quarters, with the exception of the second quarter in 2011, Ixia had been able to exceed its own guidance and analyst expectations for each quarter during the Class Period. Therefore, Ixia had cash to spare, which it had been allocating throughout the Class Period to deferred revenues to bolster its image as a growth company").

41

more than $15,000,000 in 2008 and more than $41,000,000 in 2009.[206] Stated differently, when the second amended complaint is read in conjunction with documents that are incorporated by reference therein, it appears that defendants began to defer revenue in 2008 and 2009; to the extent this is true, defendants purposefully *decreased* Ixia's current revenue and made its losses and missed forecasts appear *worse* than they actually were. It defies economic reason, and is therefore implausible, that a company would intentionally engage in a scheme to *understate* its revenue and *overstate* its losses in years it was losing money and missing its guidance. See *Kalnit*, 264 F.3d at 140-41 ("Where 'plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent'"); *Shields*, 25 F.3d at 1130 ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed self interest"); *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 206 (E.D.N.Y. 2000) ("At a minimum, the alleged purpose must be in the informed economic self-interest of the defendant"); *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable [– let alone cogent and compelling –] inference of fraudulent intent").

This conclusion is reinforced by other facts that plaintiffs allege. Ixia, for example, also purportedly missed its guidance for the second quarter of 2011.[207] Defendants maintain that if Ixia had, in fact, been engaged in revenue smoothing, it would have drawn on deferred revenues to avoid the earnings miss. Instead, it allegedly did the opposite, continuing intentionally to defer revenue that should have been recognized. This resulted in *lower* revenue and earnings, making the second quarter 2011 earnings miss *worse*.[208] As a consequence, Ixia's share price allegedly fell by 24% – more than twice as much as it dropped after the second restatement was issued.[209] Plaintiffs offer no plausible explanation as to why defendants would have reported an earnings miss in the second quarter of 2011 if they had a reserve of deferred revenue they could tap to prevent such an occurrence. See *Kalnit*, 264

---

[206]Rieder Decl., Exh. 6 (Ixia's 2012 Form 10-K) at 43.

[207]SAC, ¶ 127.

[208]*Id.*, ¶¶ 127-131.

[209]*Id.*, ¶¶ 127, 228.

F.3d at 140-41; *Shields*, 25 F.3d at 1130 ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed self interest").

Although they do not explain the earnings miss in the second quarter of 2011, plaintiffs allege that because Ixia had "padded" its deferred revenue in prior periods, it was able to dip into the "deferred revenue[ ] basket and improperly recognize[ ] revenue[ ]" in the first two quarters of 2013 to mask declining revenue from its historic business.[210]  Plaintiffs assert that, to correct this premature revenue recognition, the company issued the third restatement in 2014.  It is unclear, however, how the revenue incorrectly recognized in the first two quarters of 2013 could have been drawn from "padded" deferred revenues.  This is because, as plaintiffs allege, the second restatement corrected Ixia's prior revenue deferral errors by recognizing incorrectly deferred revenue in the proper reporting period.[211]  Based on plaintiffs' allegations, by the end of fiscal year 2012, after the second restatement was issued, the deferred revenue "basket" would have been empty, and there would have been no inflated deferred revenue that Ixia could have moved to recognized revenue during the first two quarter of 2013.  As a consequence, defendants argue, the revenue smoothing theory is implausible.  The court agrees with defendants that, to the extent the second amended complaint asserts a revenue smoothing theory of fraud, the theory defies economic reason and fails for that reason.

Plaintiffs counter that defendants' revenue smoothing argument does not withstand scrutiny, because their primary theory is that defendants sought to position Ixia as a growth company, not to smooth revenue from quarter to quarter.[212]  They assert that the "cash to spare" allegations are not the *sine qua non* of their complaint, and that, fairly read, the complaint alleges "that the need to show growth prospects trumped any desire to report higher current earnings."[213]  They also note that although Ixia reported losses and missed guidance in 2008 and 2009, it would have done so even had it not deferred revenue.  They maintain there is "nothing inconsistent about deferring recognition of revenue

[210]*Id.*, ¶¶ 46, 115.

[211]*Id.*, ¶¶ 98-101.

[212]Opposition at 7.

[213]*Id.* at 8.

to show growth prospects, even if it results in a current loss that is slightly larger than it would [have been] otherwise, or if it results in missing guidance in a current period by a bit more than would otherwise [have been] the case."[214] Plaintiffs make the same argument with respect to the second quarter of 2011 loss. They contend, once again, that defendants' assertion that Ixia would have drawn from deferred revenue to avoid the earnings miss is a straw man argument as "the essence of the scheme . . . was to show future growth prospects, not revenue smoothing," and "[i]t was not inconsistent with [a] focus on future growth prospects to allow a current quarter to show a loss" in order to inflate deferred revenue as a way of showing the prospects for growth.[215]

Plaintiffs argue that their theory of overstating deferred revenue to create a false image of growth is plausibly alleged. Defendants counter that plaintiffs' theory makes sense only if *defendants* believed the market viewed deferred revenue as an indicator of Ixia's overall growth prospects. The second amended complaint contains numerous references to the fact the market considered deferred revenue important, and in assessing whether the complaint is adequately pled, the court must accept those allegations as true.[216] Assuming, as the court must, that the market viewed deferred revenue as important in assessing the likelihood of future growth, it plausibly follows that defendants knew this. To the extent defendants contend their knowledge of the market's view is insufficiently pled, they place the pleading bar too high. While defendants' view of events may be as compelling as plaintiffs', the court cannot dismiss plaintiffs' theory outright. Consequently, it turns to the adequacy of their allegations of scienter.

---

[214]*Id*. at 7-8.

[215]*Id.* at 8-9.

[216]See, e.g., *id*., ¶ 52 ("During the period that Ixia was building its story as a growth company, analysts were paying close attention to Ixia's deferred revenues, and in particular, were focused on Ixia's ability to generate service-based or other types of renewable, recurring revenues"); *id.*, ¶ 54 ("This demonstrates that deferred revenues pertaining to Ixia's service-based and maintenance contracts were particularly important to investors"); *id.*, ¶ 3 ("As discussed below, and reflected in the analyst reports, deferred revenue is a material number for investors analyzing a smaller company like Ixia that is portraying itself as a growth company with an outlook of increasing revenue into the future").

44

**2.    Whether the Complaint Alleges Facts That Give Rise to a Strong Inference of Scienter**

**a.    Individual Allegations of Scienter**

Defendants' arguments concerning plaintiffs' pleading of scienter focus on the allegations concerning: (1) Ixia's GAAP violations and inadequate internal controls; (2) stocks sales by certain individual defendants; and (3) Alston's resignation.[217]

**(1)    Violation of GAAP and Inadequate Internal Control**s

Defendants first contend that plaintiffs' allegations concerning purported GAAP violations and Ixia's failure to maintain adequate internal controls do not suffice to plead scienter.[218]  In dismissing plaintiffs' first amended complaint, the court found that the GAAP violations corrected by the second restatement and allegedly lax internal controls regarding revenue recognition did not support a strong inference of scienter.[219]

As noted, the second restatement corrected two errors.  The first – which defendants denominate the "accounting practice error" – involved recognizing revenue for warranty and software maintenance contracts on the first day of the month following the effective date of the contract.  The revenue should have been recognized on the effective date itself.[220]  The second error – which defendants call the "implied arrangement error" – concerned Ixia's continued deferral of revenue for a warranty and software maintenance contract after the contract term had ended on the basis that Ixia deemed continuation of the relationship implied. Ixia should have ceased treating the arrangement as implied when it received an extended warranty and software maintenance services contract.  The company had previously (and incorrectly) "continue[d] to defer revenue for implied warranty and software

---

[217]Combined Motion at 9-24.  They also attack the sufficiency of the CW allegations.  Those allegations concern purported violations of GAAP, and are addressed in analyzing the sufficiency of that aspect of plaintiffs' claims.

[218]*Id*. at 9-10.

[219]Order at 52.

[220]Rieder Decl., Exh. 6 (Ixia's  Form 10-K for Fiscal Year Ended December 31, 2012) at 114

45

maintenance arrangements (despite the receipt of an initial . . . extended warranty and software maintenance contract) until [it] could establish a pattern . . . [through], among other items, (i) the consistent receipt of extended renewal orders from the specific customer for warranty and software maintenance services and (ii) senior management's assertion that warranty and software maintenance services would not be provided to the customer if existing contracts were canceled or were not renewed."[221]

"In general, the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco Partners*, 552 F.3d at 1000. The same holds true for alleged violations of GAAP and inaccurate Sarbanes-Oxley certifications. See *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) ("Thus, mere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter," citing *In re Software Toolworks, Inc.*, 50 F.3d 615, 628 (9th Cir. 1994)); *Glazer Capital Management*, 549 F.3d at 747 ("Because Congress expressed no intent to alter the pleading requirements of the PSLRA, 'Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements,'" quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).

The Ninth Circuit has recognized two narrow exceptions to this general rule, however. See *Zucco Partners*, 552 F.3d at 1000.

"First, a restatement due to accounting violations, without more, may be sufficient to establish a strong inference of scienter under those limited circumstances where the nature of the relevant [violation] is of such prominence or obviousness that it would be absurd to suggest that management was without knowledge of the violation. Second, an accounting violation may itself be indicative of scienter where it is combined with allegations regarding . . . management's role in the company that are particular and suggest that the defendant must have known its accounting methodology was wrong."

*In re Medicis Pharm. Corp. Securities Litigation* ("*Medicis I*"), 689 F.Supp.2d 1192,

---

[221]*Id.*

1204 (D. Ariz. 2009) (quoting *Zucco Partners*, 552 F.3d at 1000, and *South Ferry*, 542 F.3d at 785) (internal quotation marks omitted) (alteration original)).

### (a)     Whether the Error Was Prominent or Obvious

Defendants contend that the second amended complaint does not allege any facts concerning the individual defendants' roles that indicate they had actual access to information that Ixia was incorrectly accounting for revenue from warranty and software maintenance contracts.[222] Plaintiffs allege that SOP 97-2 generally governs the recognition of "revenue on software maintenance and warranty contracts."[223] They cite section .08 of SOP 97-2, which provides:

"If the arrangement does not require significant production, modification, or customization of software, revenue should be recognized when all of the following criteria are met:

• Persuasive evidence of an arrangement exists.

• Delivery has occurred.

• The vendor's fee is fixed or determinable.

• Collectibility is probable."[224]

Plaintiffs allege that by "deferring revenue until the first calendar month following the effective date of [a] software maintenance and warranty contract[ ], instead of recognizing revenue as soon as it had evidence that a contract had been entered into, Ixia violated SOP 97-2."[225]

To plead scienter under the first *Zucco Partners* exception,

"[a] plaintiff . . . cannot merely point at a GAAP principle and contend that a correct interpretation was simple or obvious. At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that princip[le] was being interpreted. The plaintiff must then plead

---

[222]Combined Motion at 10.

[223]*Id.*, ¶ 167.

[224]*Id.*

[225]*Id.*, ¶ 168.

47

facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing." *In re Medicis Pharm. Corp. Sec. Litig.* ("*Medicis II*"), No. CV 08-1821 PHX GMS, 2010 WL 3154863, *5 (D. Ariz. Aug. 9, 2010) (citing *Medicis I*, 689 F.Supp.2d at 1204 (in turn citing *Zucco Partners,* 552 F.3d at 1000; *South Ferry,* 552 F.3d at 785).

Defendants maintain that plaintiffs' allegations fail adequately to identify the particular accounting rules that were violated because they plead no facts that indicate section .08 was the GAAP rule that the two accounting errors corrected by the second restatement violated. Plaintiffs do not appear to dispute the fact that the second amended complaint does not plead facts plausibly suggesting that Ixia's restatements were triggered by a violation of section .08. Rather, they contend that they are not required to identify the particular subsection of SOP 97-2 at issue because they can plead "broadly that SOP 97-2 was involved in both restatements, and that the [f]irst [r]estatement put [d]efendants on notice that SOP 97-2 applie[d]."[226] Plaintiffs cite *S.E.C. v. Collins & Aikman Corp.*, 524 F.Supp.2d 477, 495 (S.D.N.Y. 2007), as support for this proposition. There, the court addressed whether the SEC's complaint sufficiently "[pled] falsity [despite the fact that] it fail[ed] to identify the specific provision of GAAP that [the defendants] allegedly violated." *Id*. The court held that "Rule 9(b) does not require the court to delve into the minutiae of accounting regulations at the pleading stage. On the contrary, at this stage, it is sufficient for plaintiff to allege with specificity defendant[s'] fraudulent actions." *Id*. Because the SEC had "alleged with particularity" that defendants intended to falsify financial statements, the court concluded they had "more than adequate notice of the fraudulent activity at issue." *Id*.

*Collins & Aikman* is inapposite. There, defendants challenged the adequacy of the S.E.C.'s pleading of falsity. Here, by contrast, defendants challenge plaintiffs' pleading of scienter; they argue that the GAAP violations alleged do not give rise to a cogent and compelling inference of scienter. As the court stated in its order dismissing the first amended complaint, "*Zucco Partners* and *South Ferry* make clear[ that] to rely on defendants' purported violation of GAAP principles to prove scienter,

---

[226]Opposition at 14.

48

plaintiffs must plead facts demonstrating that defendants knew of the relevant principles and knew how the company was interpreting them." See *Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, __ F.Supp.3d _, 2014 WL 4978568, *24 (C.D. Cal. Oct. 6, 2014); *Medicis II*, 2010 WL 3154863 at *5 ("At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that princip[le] was being interpreted"). Stated differently, allegations concerning the GAAP principle that was violated must be sufficiently precise to give rise to an inference that defendants *knew* of the rule and *knew* how the company was interpreting it. SOP 97-2 has 149 separate subsections;[227] thus, alleging "broadly" that SOP 97-2 applied is insufficient to support such an inference.

Because the complaint specifically references section .08 of SOP 97-2, however, the court examines plaintiffs' allegations concerning that section. The court agrees with defendants that the second amended complaint does not adequately allege that they knew of the rule, knew how Ixia was interpreting it, or – most critically – knew that the company's interpretation violated section .08 or any other aspect of GAAP. Plaintiffs contend defendants must have known that SOP 97-2 applied, because the first restatement and the second and third restatements involved the identical issue – recognition of revenue from service and warranty contracts, and thus "the same provision [SOP 97-2] [was] involved in [all the restatements]."[228] They also allege that Miller was Ixia's CFO at the time of the first restatement in 2007, and that Bhatnagar was hired as COO only months later. Plaintiffs contend the individual defendants would have been keenly aware of issues surrounding the 2007 restatement and of the requirements of SOP 97-2.[229]

Defendants counter that the first restatement did not involve software service maintenance

---

[227]See Statement of Position 97-2 – Software Revenue Recognition, available at http://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176156442593&acceptedDisclaimer=true (last accessed March 31, 2015). The court *sua sponte* takes judicial notice of SOP 97-2. See *Medicis I*, 689 F.Supp.2d at 1205 ("The Medicis Defendants take issue with SOP 97–2 because it was not referenced in the Amended Complaint. This, however, is not fatal because such financial accounting standards are the proper subjects of judicial notice," citing *In re New Century,* 588 F.Supp.2d at 1219).

[228]*Id.,* ¶ 204.

[229]*Id.,* ¶ 205.

contracts – as the second and third restatements did – but rather concerned accounting for implied post-contract consumer support ("PCS") obligations.  The errors corrected by the first restatement arose because by continuing to provide PCS-type services to customers after any contractual obligation to do so had expired, Ixia implied post-contract customer support obligations and did not properly allocate revenue in light thereof.[230]  The first  restatement explained:

> "The implied PSC obligations should have resulted in an additional deferral of revenue when the products were initially shipped.  Specifically, SOP 97-2 requires that we re-allocate certain previously reported product revenues, which revenues have generally been recognized at the time of product shipment, to implied PCS revenues, which revenues are required to be recognized over the multi-year period during which the implied PCS obligations are in effect (such multi-year period would typically begin 12 months after the date of product shipment). As noted above, our previous practice at the time of sale of a software product was to allocate revenue to PCS only for the initial contractual 12 months of PCS."[231]

Thus, as the court recognized in its prior order, the first restatement required correction and reallocation of *overstated* product revenue.  Unlike the errors corrected by the second restatement, the error that prompted the first restatement concerned deferral of too little revenue – not too much.  It follows that a failure to adhere to section .08 could not have been the cause of the first restatement.  This is because, as plaintiffs allege, the criteria set forth in section .08 as to when revenue from a software maintenance agreement should be recognized were necessarily satisfied long before the implied PCS obligations arose.  Section .08 therefore had no relevance to the first restatement.[232]  Plaintiffs' assertion that as a result of the first restatement, defendants knew of the particular accounting errors at issue in the second

---

[230]Rieder Decl., Exh. 1 (First Restatement) at 45.

[231]*Id.*

[232]Although the third restatement, like the first restatement, also involved overstatement of product revenue, the overstatement came at the expense of deferred revenue; this does not fit with plaintiffs' theory that defendants' accounting manipulation was designed to increase deferred revenues. (*Id.*, ¶ 110.)

restatement is therefore unavailing.

Because no facts are pled suggesting that defendants knew section .08 applied to the recognition of revenue from software service and warranty contracts that was corrected in the second restatement, and because the issues that led to the first restatement are sufficiently dissimilar that the first restatement did not put defendants on notice of section .08, plaintiffs have not plausibly alleged that defendants knew of the alleged GAAP violation. *A fortiori* they have not alleged adequately that defendants knew how the company was interpreting section .08, or that they knew the interpretation violated section .08 or any other aspect of GAAP. The complaint, in fact, contains no allegations concerning the latter subjects. Plaintiffs merely quote section .08. They do not allege facts showing that application of the rule is so simple or obvious that scienter can be inferred from the mere fact it was violated. For all of these reasons, the allegations are insufficient to plead plausibly that the violation falls within the first *Zucco Partners* exception. See *Zucco Partners*, 552 F.3d at 1000 ("[T]he mere publication of a restatement is not enough to create a strong inference of scienter"); *Medicis II*, 2010 WL 3154863 at *5 ("A plaintiff . . . cannot merely point at a GAAP principle and contend that a correct interpretation was simple or obvious. At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that principal was being interpreted. The plaintiff must then plead facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing").

Plaintiffs also attempt to invoke this exception through allegations concerning information obtained from of confidential witnesses. They allege that CW3 was involved in meetings with Ixia's CEO and CFO at which "Ixia's revenue recognition practices, including how revenue should be recognized for warranty and software maintenance contracts," were addressed.[233] Plaintiffs' allegations

---

[233]SAC, ¶ 217 ("[Ixia] improperly recognized product revenues when the additional products were shipped *rather than deferring a portion of the consideration and recognizing the related revenues over the remaining term* of the applicable fixed fee, multi-year extended maintenance and warranty arrangements. For certain other sales transactions, the Company recognized product revenues *prematurely* (i) in advance of delivering certain product functionality or other deliverables that were committed to be provided to the customers or (ii) due to an incorrect assessment of certain

51

concerning CW3 do not give rise to a cogent and compelling inference of scienter. The fact that revenue recognition was "discussed" at the meetings CW3 attended does not support an inference that the CEO and CFO knew Ixia was recognizing revenue incorrectly. Plaintiffs do not allege that the discussions addressed section .08 or any other accounting principle. They do not mention GAAP in any way; nor do they allege that whether Ixia's accounting for warranty and software maintenance contracts complied with section .08 or another accounting principle was discussed. Thus, the allegations do not suffice to plead scienter. See Z*ucco Partners,* 552 F.3d at 995 ("[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter).[234]

Plaintiffs also contend that Ixia admitted that senior management "was involved in [deciding] . . . whether to defer revenue."[235] The second amended complaint does not plausibly allege that this is the case, however. Plaintiffs cite the "implied arrangement error," i.e., the fact Ixia reported that whether to defer revenue was evaluated on a "customer-by-customer basis depending on 'senior management's assertion that warranty and software maintenance services would not be provided to the customer if existing contracts were canceled or were not renewed.'"[236] The fact that senior management was involved in deciding whether to provide software maintenance services to customers in the absence

multiple-element arrangement sales transactions which included professional services that were provided based on a purchase order separate from the product purchase order but that were negotiated concurrently with the customer." (emphasis added)).

[234]CW3 also purportedly reported that PwC's determination that Ixia's historical revenue recognition practices were inconsistent with GAAP "was not well received by Ixia." (SAC, ¶ 222.) The fact this information was not well-received does not suggest that Ixia or the individual defendants knew of the alleged violation before PwC advised them that this was the case. As defendants note, moreover, the reaction could reflect frustration that Ixia's long-time auditor had provided bad advice on the subject.

[235]*Id.*, ¶¶ 208-11.

[236]*Id.*, ¶ 210.

of an express contract does not plausibly show senior management knew the accounting implications of the practice, however. Nor does it constitute an admission that senior management was "involved in the decision as to whether to defer revenue." Thus, this allegation does not plausibly suggest that the individual defendants were aware of the historical accounting practice that led to the implied arrangement error.[237]

For all these reasons, plaintiffs have not sufficiently alleged that the case falls within the first *Zucco Partners* exception.

### (b)    Management's Role

"An accounting violation 'may [also] be indicative of scienter where it is combined with 'allegations regarding . . . management's role in the company' that are 'particular and suggest' that the defendant[s] must have known [the company's] accounting methodology was wrong." *Medicis I*, 689 F.Supp.2d at 1204 (quoting *Zucco Partners*, 552 F.3d at 1000 (in turn quoting *South Ferry,* 542 F.3d at 785)).

Plaintiffs allege that Ixia's management had a responsibility to ensure the company's compliance with GAAP and implement effective internal financial controls.[238]  "[G]eneral allegations about 'management's role in a corporate structure,'" such as those plaintiffs plead, do not give rise to a strong inference of scienter unless they are "buttressed with 'detailed and specific allegations about management's exposure to factual information within the company." *Zucco Partners*, 552 F.3d at 1000 (citation omitted); *In re Taleo Corp. Securities Litigation*, No. C 09–00151 JSW, 2010 WL 597987, *8 (N.D. Cal. Feb. 17, 2010) (plaintiff "must allege facts to show that 'the defendants knew specific facts at the time that rendered their accounting determinations fraudulent'" (citation omitted)).  The second amended complaint contains no detailed or specific allegations concerning the individual defendants' exposure to factual information that buttress the generalized allegations concerning management's responsibility to ensure compliance with GAAP.  The mere fact that "[m]anagement" was responsible

---

[237]In addition, plaintiffs include no allegations concerning the GAAP principle that governs the implied arrangement error. Section .08 does not apply because it does not concern implied arrangements or when they cease to exist for purposes of revenue recognition.

[238]SAC, ¶¶ 208-09.

for assuring compliance with GAAP and adequate internal controls does not demonstrate that any individual defendant was involved in or aware of the particular accounting practices being challenged.[239]   Similarly, plaintiffs' allegation that Ixia's audit committee met regularly with

---

[239]With respect to plaintiffs' allegations that management was responsible for ensuring adequate internal financial controls were in place, and that individuals defendants violated Sarbanes-Oxley, the only new allegation in the second amended complaint is that Ixia's management team met with the audit committee. (*Id.*, ¶ 211.)  As noted, this does not demonstrate that the individual defendants recklessly disregarded or intentionally exploited internal control deficiencies or knowingly or recklessly signed Ixia's financial statements.  Once again, therefore, these allegations are insufficient because they "do not plead specific facts" that give rise to a strong inference of scienter.  See *In re Maxwell Technologies, Inc. Securities Litigation*, 18 F.Supp.3d 1023, 1040-41 (S.D. Cal. 2014) ("Plaintiff appears to argue in the briefing that, given the nature of the violation, Defendants could not have missed the violations if they evaluated the internal controls as they claimed.  Although the large amount at issue suggests Plaintiff's argument may be plausible, this Court does not have the information to evaluate this argument and conclude there is a strong inference of scienter.  Plaintiff has not presented the necessary information about accounting principles and internal controls to allow this Court to evaluate whether the individual defendants should have been or must have been aware of the violations"); *In re ChinaCast Educ. Corp. Securities Litigation*, No. CV 12–4621–JFW (PLAx), 2012 WL 6136746, *7 (C.D. Cal. Dec. 7, 2012) ("Plaintiffs allege that ChinaCast's auditor, Deloitte, 'warned the Board that serious internal control weaknesses existed.'  However, 'allegations that Defendants had deficient internal controls during the class period do[ ] not create a strong inference that Defendants knowingly [made] false or misleading statements,'" quoting *In re Loudeye Corp. Securities Litigation*, No. C06-1442MJP, 2007 WL 2404626, *7-8 (W.D. Wash. Aug. 17, 2007) (holding that allegations "[t]hat the controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim")); *Karpov v. Insight Enterprises, Inc.*, No. CV09-856-PHX-SRB, 2010 WL 2105448, *10 (D. Ariz. Apr. 30, 2010) ("Allegations that Insight had material weaknesses in its internal controls do not, standing alone, give rise to a strong inference of scienter on the part of the company or its executives"); *In re Hypercom Corp. Securities Litigation*, No. CV-05-0455-PHX-NVW, 2006 WL 1836181, *9  (D. Ariz. July 5, 2006) ("the fact that Hypercom issued a press release recognizing a lack of effective internal controls, is not overly probative as to whether Smolak intentionally misclassified the leases"); see also *In re Hansen Natural Corp. Securities Litigation*, 527 F.Supp.2d 1142, 1158 (C.D. Cal. 2007) ("Presumably every company that issues a financial restatement because of GAAP errors will cite as a reason lack of effective controls").

Plaintiffs cite two cases, *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 988 (9th Cir. 2008), and *Stocke v. Shuffle Master, Inc.*, 615 F.Supp.2d 1180, 1191 (D. Nev. 2009), that they contend compel a contrary conclusion.  Neither supplies a basis for revisiting the court's prior ruling. *Applied Signal* does not concern internal controls or Sarbanes-Oxley violations.  Plaintiffs contend it supports their position because the court there inferred that defendants had knowledge of stop-work orders on significant customer contracts because they were corporate officers directly responsible for the company's day-to-day operations. (Opposition at 22.)  It is true that the *Applied Signal* court drew such an inference, but only because "facts [concerning the stop-work orders] were prominent enough

management to discuss the company's financial statements does not indicate that the individual defendants knew of the erroneous reporting practices or the applicable GAAP provisions.[240]

None of the confidential witnesses, moreover, provides information that give rise to a compelling inference of scienter. As discussed, CW3's statements are not sufficiently detailed to give rise to such an inference. CW2 merely "confirmed that [Will] Liang was hired as a 'director of revenue recognition' in 2007."[241] While this may suggest the company understood that revenue recognition was important, it does not support an inference that defendants knew and/or approved accounting errors concerning revenue recognition. Plaintiffs' allegations in the second amended complaint concerning CW1 are

that it would be 'absurd to suggest' that top management was unaware of them." See 527 F.3d at 989. Knowledge of the adequacy of internal controls is simply of a different character than the stop-work orders at issue in *Applied Signal*. Consequently, the court finds *Applied Signal* inapposite. Additionally, most courts that have considered the matter have concluded that merely signing the certification required by Sarbanes-Oxley does not suffice to give rise to a strong inference of scienter. See, e.g., *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc*., 576 F.3d 172, 177-78, 196 (4th Cir. 2009) (dismissing a § 10(b) claim because plaintiff's allegations did not give rise to a strong inference of scienter despite the fact that the individual defendants signed Sarbanes–Oxley certifications); *Cozzarelli v. Inspire Pharmaceuticals Inc*., 549 F.3d 618, 628 n. 2 (4th Cir. 2008) ("Plaintiffs further allege that Shaffer lied when she certified Inspire's financial statements in accordance with the Sarbanes-Oxley Act of 2002, but that bare allegation does not provide independent support for an inference of scienter"); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 555 (5th Cir. 2007) ("We hold that the Sarbanes–Oxley certifications at issue here do not permit an inference of scienter"); *Garfield v. NDC Health Corp*., 466 F.3d 1255, 1266 (11th Cir. 2006) ("[W]e hold that a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements. This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions"). Plaintiffs have simply alleged insufficient facts to support a finding that the accounting errors in Ixia's financial statements were "glaring" and that defendants who signed the Sarbanes-Oxley certifications knew or should have suspected from this or other "red flags" that the financials contained material misstatements or omissions.

Plaintiffs also rely on *Stocke*. While this case concerned continuing internal control deficiencies, the complaint alleged that defendants knew about the internal control deficiencies, represented they would be corrected the following year, and then reported in the subsequent year's Form 10-K that the deficiencies still existed. *Stocke*, 615 F.Supp.2d at 1191. Here, there is no allegation plausibly suggesting that defendants knew of internal control deficiencies prior to the second restatement. *Stocke* is therefore also inapposite.

[240]*Id.*, ¶ 211.

[241]*Id.*, ¶ 216.

identical to those in the first amended complaint.[242]  The court previously found the allegations insufficient to plead scienter.  Specifically, it found that "[p]laintiffs' allegations concerning CW1's statement that everyone at Ixia above [Will] Liang would have participated in deciding how revenue would be recognized [were] not 'accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge.'"  *In re Siebel Systems, Inc.*, 2005 WL 3555718 at *8-9; *In re Metawave Communications Corp.*, 298 F.Supp.2d at 1068.  The court concluded the allegations did not suffice to plead scienter.  See *Zucco Partners,* 552 F.3d at 995 ("[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements.  First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter").  The same is true with respect to the second amended complaint.   As a result, the court cannot conclude that plaintiffs have adequately alleged that they fall within the second *Zucco Partners* exception.

### (c)    Core Operations Inference

Plaintiffs also contend that scienter can be inferred because deferred revenue was a "key metric" involving "core operations" of Ixia that analysts had highlighted as indicative of the company's future growth prospects.[243]   The Ninth Circuit has held that "in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA." *South Ferry*, 542 F.3d at 785.  As the court noted in its order dismissing the first amended complaint, the principal case that delineates the contours of the "unusual circumstances" to which the Ninth Circuit referred is *Applied Signal*, 527 F.3d 982.  There, the Ninth Circuit held that a securities fraud plaintiff could rely on an inference arising from the fact that the purported fraud concerned a corporation's core operations without particularized allegations concerning defendants' access to relevant information.  Defendants allegedly failed to disclose two stop-work

---

[242]*Id.*, ¶ 212-16.

[243]SAC, ¶¶ 218-21.

orders from one of Applied Signal's largest customers despite the fact that those orders had "a devastating effect on the corporation's revenue." *Id.* at 987. The first stop-work order "halted between $10 and $15 million of work on the company's largest contract with one of its most important customers," while the second stopped $8 million worth of work. *Id.* at 988 n. 5. The court observed that "[t]he size of the contract[s] and the prominence of the client[s] raise[d] a strong inference that defendants would [have] be[en] aware of th[e stop-]order[s]." *Id.* at 988 n. 5; see also *South Ferry*, 542 F.3d at 785 n. 3 (stating that the customers at issue in *Applied Signal* "made up 80% of the company's revenue, making the loss of even one contract disastrous for the entire company"). Defendants, moreover, admittedly knew about the stop-work orders only two weeks after the allegedly false statements were made because they disclosed them in an SEC filing. *Id.* As *South Ferry* court summarized, "[a]ll of these factors put *Applied Signal* into the exceedingly rare category of cases in which the core operations inference, without more, is sufficient under the PSLRA." *South Ferry*, 542 F.3d at 785 n. 3.

Here, in contrast to *Applied Signal*, plaintiffs do not allege facts from which the court can infer that deferred revenue from service and maintenance contracts was part of Ixia's "core operations." The second amended complaint, like the first amended complaint, contains no allegations from which one could infer that service and maintenance contracts on the company's hardware products were "core operations." Courts applying the doctrine have generally "required that the operation in question constitute nearly all of a company's business before finding scienter." See *Tyler v. Liz Claiborne, Inc.*, 814 F.Supp.2d 323, 343 (S.D.N.Y. 2011); see also *Hensley v. IEC Electronics Corp.*, No. 13 CV 4507 JMF, 2014 WL 4473373, *5 (S.D.N.Y. Sept. 11, 2014) ("Here, although the Complaint alleges that SCB was an expensive acquisition that IEC touted, SCB cannot be said to have 'constitute[d] nearly all' of IEC's business. In fact, for fiscal year 2011, SCB contributed only about fifteen percent of IEC's total revenue"). The second amended complaint alleges that Ixia's *sale of products* accounted for more than 80% of its revenue; thus, the 2service contracts could have

accounted only for less than 20%.[244]  This is insufficiently substantial to warrant a finding that software service and maintenance contracts were "core."

Plaintiffs counter that deferred revenue equaled two-thirds of Ixia's reported revenue each quarter.[245]  The second amended complaint does not allege, however, what percentage of deferred revenue was generated by the sale of services or by software maintenance and service contracts.  Thus, the mere fact that two-thirds of Ixia's reported revenue was deferred does not plausibly suggest that software service and maintenance contracts were a "core business."  More fundamentally, the fact that deferred revenue accounted for two-thirds of all of Ixia's revenue does not change the fact that Ixia's sale of products accounted for more than 80% of that revenue.[246]  Thus, software service/maintenance revenue, whether deferred or not, accounted for less than 20% of Ixia' overall quarterly revenue.

Furthermore, as the court found in its order dismissing the first amended complaint, even were deferred revenue associated with a "core operation," this case is distinct from *Applied Signal*.[247]

[244]*Id.*, ¶ 53 ("In its July 21, 2010 analyst report, Wunderlich further reported that it forecast that Ixia's revenues in the second quarter 2010 were derived 81.7% from product sales and the rest from 'services, which include software maintenance subscriptions'"); *id.*, ¶ 65 ("Wunderlich noted in a July 8, 2011 report that 'with more than 80% of revenue from product sales, Ixia does not benefit from the flywheel effect of a strong subscription revenue base (software maintenance revenue)'"); *id.*, ¶ 219 ("Ixia's 2010 Form 10-K, filed on March 4, 2011, explained that Ixia's revenues were derived from two things: product sales and services.  Revenue from services was responsible for 17% of Ixia's total revenues for the year ending December 31, 2010"); *id.*, ¶ 220 ("Ixia's Form 10-K for the year ending December 31, 2011, filed on March 5, 2012, . . . [stated that] [f]or the year ending December 31, 2011, service revenues were responsible for over 19% of Ixia's total revenues").

[245]SAC, ¶ 221.

[246]*Id.*, ¶ 53 ("In its July 21, 2010 analyst report, Wunderlich further reported that it forecast that Ixia's revenues in the second quarter 2010 were derived 81.7% from product sales and the rest from 'services, which include software maintenance subscriptions'"); *id.*, ¶ 65 ("Wunderlich noted in a July 8, 2011 report that 'with more than 80% of revenue from product sales, Ixia does not benefit from the flywheel effect of a strong subscription revenue base (software maintenance revenue)'"); *id.*, ¶ 219 ("Ixia's 2010 Form 10-K, filed on March 4, 2011, explained that Ixia's revenues were derived from two things: product sales and services.  Revenue from services was responsible for 17% of Ixia's total revenues for the year ending December 31, 2010"); *id.*, ¶ 220 ("Ixia's Form 10-K for the year ending December 31, 2011, filed on March 5, 2012, . . . [stated that] [f]or the year ending December 31, 2011, service revenues were responsible for over 19% of Ixia's total revenues").

[247]Order at 46.

The misrepresentation here involves allegedly intentional misapplication of accounting principles – not nondisclosure of purportedly disastrous information about which defendants *admitted* they knew within two weeks after the alleged misstatements were made.  Compare *Applied Signal*, 527 F.3d at 987, 988 n. 5; see also *Zucco Partners*, 552 F.3d at 1001 (distinguishing *Applied Signal* because "the alleged misrepresentations [at issue in *Zucco Partners* did] not concern especially prominent facts," and "the falsity of the original representations would not be immediately obvious to corporate management" because "reporting false information will only be indicative of scienter where their falsity is patently obvious").

Numerous courts have found that accounting and related tax determinations are not part of a company's core operations.  See *Hensley*, 2014 WL 4473373 at *5 ("Further, accounting for 'work-in-process' inventory – the source of the error that led to the restatement and the alleged false statements by Defendants – could not be described as (and, more to the point, is not alleged in the Complaint to be) a 'core operation' of SCB, let alone IEC"); *In re OSG Sec. Litig.*, 917 F.Supp.2d 387, 409 (S.D.N.Y.2013) ("The Company's core operation is shipping, not tax policy"); *In re JP Morgan Chase Securities Litigation*, 363 F.Supp.2d 595, 628 (S.D.N.Y. 2005) ("[P]laintiffs allege no facts suggesting that the accounting treatment of the Mahonia transactions as trades rather than as loans was at the core of JPM Chase's business"); accord *Cho v. UCBH Holdings, Inc.*, No. C 09 4208 JSW, 2011 WL 3809903, *15 (N.D. Cal. May 17, 2011) ("Here, by contrast, Plaintiffs have not sufficiently alleged that the ALL and Provision calculations were part of the Bank's core operations").

Plaintiffs correctly note that none of these cases stand for the proposition that accounting practices can never be part of a company's core business.  As defendants note in their reply, however, it is difficult to imagine how the accounting practice at issue was "core" when Ixia's "total revenues for fiscal years 2010 and 2011 were adjusted upwards by less than 1% as a result of the [s]econd [r]estatement['s] [corrections]."[248]  Moreover, the case plaintiffs cite on this subject – *Brown v. China Integrated Energy, Inc.*, 875 F.Supp.2d 1096, 1123 (C.D. Cal. 2012) – is distinguishable.  There, the court held that it "strain[ed] credulity to believe that [defendant's] directors and officers did not know

---

[248]Reply at 30 (citing Rieder Decl., Exh. 6 (Second Restatement) at 116).

that a factory that was purportedly so critical to the company's business that it generated 20% of total company sales was not functioning." *Id.* In this case, we are dealing with accounting errors respecting software warranty and service contracts. In combination, service contracts accounted for less than 20% of Ixia's revenue while the accounting error resulted in a less than 1% shift in revenue for fiscal years 2010 and 2011. Plaintiffs' reliance on *Brown* is therefore unavailing. In sum, plaintiffs have not demonstrated that the court should reach a different result than decisions holding that an accounting practice like the one at issue here is not part of a company's core operations.

Consequently, the court cannot find that a strong inference of scienter arises because the alleged fraud concerned Ixia's core operations.

**(d) Magnitude, Duration, and Simplicity of the Violations**

Plaintiffs next argue that the accounting errors were of such a magnitude, duration, and simplicity that they give rise to an inference of scienter. They made this same argument in their opposition to defendants' motion to dismiss the first amended complaint. The court found it unavailing because plaintiffs had not cited case law "suggesting that the reporting of deferred revenue . . . is so basic that a court can infer scienter from the mere fact that it was reported improperly."[249] Plaintiffs now contend it was clear that SOP 97-2 applied to Ixia's software warranty and maintenance contracts and that the "straightforward application of SOP 97-2 to revenue[ ] from software and related arrangements, including warranty and maintenance agreements, provides further support for an inference of scienter."[250]

In analyzing the pleading of scienter, it is appropriate to consider whether "the GAAP provision at issue [was or] was not a simple accounting policy." *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 792 (11th Cir. 2010). The purported simplicity of the error, however, is not the only consideration. Courts also look to the magnitude of the alleged violation. See *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004) (holding that an inference of scienter "may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and *so great*

[249]Order at 48.

[250]Opposition at 20.

60

*in magnitude*, that they should have been obvious to a defendant"); *Medicis II*, 08 1821 PHX GMS, 2010 WL 3154863 at *4 ("The magnitude of the error, however, is not the only consideration. Courts must also weigh the complexity or simplicity of the relevant accounting standard").

Plaintiffs do contend that the magnitude and duration of the alleged GAAP violations support an inference of scienter.[251] They made a similar argument in opposition to defendants' motion to dismiss the first amended complaint. The court found it unpersuasive because

> "plaintiffs' allegations belie any argument that the magnitude of the violations was such that scienter can be inferred. Plaintiffs concede that Ixia's GAAP violations merely shifted earnings from present to future periods; overall revenues were not impacted. They quote Ixia's April 8, 2013 press release, which stated that Ixia's changed revenue recognition practices was 'generally [going to] result in a shift of revenues between accounting periods in [its] previously issued financial statements, *and [would] not have any impact on the total revenues recognized over the life of a warranty and software maintenance contract or arrangement*, although the timing of the recognition of such revenues [was] generally [going to] commence earlier and end earlier than was reflected in [its] previously issued financial statement[s].' Plaintiffs do not plead that this statement was incorrect or misleading."[252]

The second amended complaint contains the same allegations.[253] For the reasons stated in the court's prior order, the magnitude of the violations is not indicative of scienter. The more plausible, cogent, and compelling inference is that the errors escaped notice for several years because they were relatively minor and merely shifted revenues incorrectly across time.

Finally, the court cannot conclude that correct application of SOP 97-2 is straightforward or basic. Section .08 of SOP 97-2 provides:

> "If the arrangement does not require significant production, modification, or

---

[251]*Id*. at 19.

[252]Order at 50.

[253]SAC, ¶ 101.

customization of software, revenue should be recognized when all of the following criteria are met:

> • Persuasive evidence of an arrangement exists.
>
> • Delivery has occurred.
>
> • The vendor's fee is fixed or determinable.
>
> • Collectibility is probable."[254]

The rule identifies four criteria that must be met, as well as an initial requirement that the arrangement not require significant production, modification, or customization of software. Plaintiffs cite no court decisions holding that this GAAP provision is relatively straightforward or simple; they fail, moreover, to allege *how* the provision should be applied. Although they contend *Medicis II* is "instructive," that case actually confirms that their complaint does not plead facts giving rise to a strong inference of scienter. There, the court observed that despite the fact "the GAAP violation d[id] not appear to have been very large in magnitude, the relative simplicity and obviousness of the mistake present[ed] a more difficult issue." *Medicis II*, 2010 WL 3154863 at *6. The court cited two circuit decisions holding that the GAAP provision at issue in *Medicis II* was "relatively straightforward and simple." See *id.* at *7 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999) (observing that "[v]iolations of GAAP standards such as [S]FAS 48 could provide evidence of scienter"); *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994) (noting that premature recognition of revenue in violation of SFAS 48 "run[s] afoul of Rule 10b–5")). Plaintiffs cite no similar case law indicating that SOP 97-2 is straightforward or simple, nor has the court independently located any.

Even if they had, the fact that Ixia's independent auditor, PwC, failed to identify the error for a number of years may confirm that the error was not so straightforward and basic as to give rise to an automatic inference of scienter. Indeed, as noted in the court's prior order, plaintiffs "allege that Ixia needed to hire an expert, Will Liang, to handle this aspect of the company's accounting"; this

---

[254]*Id.*, ¶ 167.

undercuts their assertion that application of the accounting rule was straightforward or basic.[255] Finally, their allegation "that any competent accounting professional that has experience in the software industry would have known the correct rules to apply" is not probative of scienter. Other than Miller, none of the individual defendants is alleged to have been an accounting professional.[256] Although Miller was purportedly an "experienced accounting professional," this fact alone is insufficient to give rise to a cogent and compelling inference of scienter.[257] See *In re Hypercom Corp. Securities Litigation*, No. CV 05 0455 PHX NVW, 2006 WL 1836181, *8 (D. Ariz. July 5, 2006) ("To the extent Plaintiffs are suggesting that an inference of scienter arises whenever a mistake is made by a CFO with access to nonpublic information, this argument is rejected"); see also *In re Autodesk, Inc. Securities Litigation,* 132 F.Supp.2d 833, 844 (N.D. Cal. 2000) ("Defendants are correct in their argument that plaintiffs must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands-on' positions, because that would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position"). Accounting professionals deal with a myriad of detailed rules and standards; mere experience in the field might not suffice to alert one to misapplication of a rule with which one was not familiar.

In sum, plaintiffs' allegations concerning SOP 97-2 and the reporting of maintenance and service revenue do not suffice to show that the principle is basic or straightforward. See *Perrin v. SouthWest Water Co.*, No. 2:08-CV-7844-JHN, 2011 WL 10756419, *10 (C.D. Cal. June 30, 2011) ("Plaintiffs argue that the GAAP violations were 'basic and longstanding GAAP rules pertaining to the timing of the depreciation expenses, the need to record revenue under the accrual basis rather than the cash basis, capitalization of assets, and accounting for intercompany transactions,' but the technical language employed to explain these rules in the Complaint, as well as the exhibits attached to the Opposition, fails to illustrate the simplicity of the violated rules. Therefore, Plaintiffs fail to

[255]Order at 48-49.

[256]*Id.*, ¶ 105.

[257]See BGM Motion at 10-11.

allege a strong inference of scienter based on the 'magnitude' of the Restatement or the simplicity of the GAAP rules that were violated"). The court therefore does not agree with plaintiffs that the magnitude, duration, and simplicity of the GAAP violations permit an inference of scienter.

### (e) Conclusion Regarding Alleged GAAP Violations

Plaintiffs fail adequately to allege that Ixia's GAAP violations give rise to a cogent and compelling inference of scienter. They fail to demonstrate that either of the *Zucco Partners* exceptions that permit drawing an inference of scienter from an accounting violation applies. Specifically, they do not allege that defendants knew of the relevant GAAP provision(s) or that they knew of the manner in which the provision(s) were being interpreted. Nor do they adequately allege defendants knew that the company's interpretation violated GAAP. Additionally, plaintiffs fail adequately to allege in any detailed or particular way that management's role in the company was such that defendants must have known the accounting methodology was wrong. Plaintiffs' allegations likewise do not support their contention that accounting for service and maintenance contract was a core operation of Ixia. Finally, plaintiffs do not adequately allege that the violation was of a significant magnitude that it must have been known, nor plausibly plead that the provision purportedly misapplied was simple and obvious.

In addition, the fact that Ixia overstated current revenue and understated deferred revenue prior to the first restatement, understated current revenue and overstated deferred revenue prior to the second restatement, and finally overstated current revenue and understated deferred revenue prior to the third restatement, supports the alternate inference that defendants simply had significant difficulty accounting for software service revenue. This is especially true given that the first and third restatements involved *understatement* of deferred revenue, which cuts against plaintiffs' deferred revenue *overstatement* theory. Consequently, a strong inference of scienter does not arise from plaintiffs' allegations concerning GAAP violations.

### (2) Stock Sales

Plaintiffs also allege that a strong inference of scienter arises from the fact that the individual defendants engaged in suspicious stock sales during the class period. "Insider stock sales are not inherently suspicious." *In re Vantive Corp. Sec. Litig*., 283 F.3d 1079, 1092 (9th Cir. 2002), abrogation on other grounds recognized in *South Ferry*, 542 F.3d at 784. Nevertheless, "'unusual' or 'suspicious'

64

stock sales by corporate insiders [can] constitute circumstantial evidence of scienter[.]" *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) (citing *Silicon Graphics*, 183 F.3d at 986 (citation omitted)). Insider stock sales are only suspicious, however, if they are "'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Id.* (quoting *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1117 (9th Cir. 1989)). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citing *Silicon Graphics,* 183 F.3d at 986 (in turn citing *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir. 1996))). "[I]n determining whether the trading pattern is suspicious," courts can consider the insider's ability to trade. *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001).

### (a)     Link Between the Trade and the False Statement

"[S]tock sales are helpful only in demonstrating that certain statements were misleading and made with [scienter] when those sales are able to be related to the challenged statements." *Vantive*, 283 F.3d at 1093; *Hansen Natural*, 527 F.Supp.2d at 1160-61 ("Because Plaintiff has failed to meet his burden of demonstrating that the stock sales are related to the alleged misstatements, he has failed to demonstrate a strong inference of scienter based upon the insider stock sales"); see also *In re Syncor Int'l Corp. Securities Litigation*, 239 Fed. Appx. 318, 321 (9th Cir. June 12, 2007) (Unpub. Disp.) ("Plaintiffs principally seek to show the other defendants' scienter through 'suspicious' stock sales. But stock sales only demonstrate scienter 'when those sales are able to be related to the challenged statements.' Plaintiffs have failed to sufficiently link defendants' stock sales to any specific misleading statements"). As the *Vantive* court explained, where no link is pled and the class period is exceedingly long, it "becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with [scienter] at the times they were made. [Where this is true, it] operates to the detriment of the plaintiffs, because it is their burden under the PSLRA to provide a clear context from which [the court] can find a strong inference of fraud." *Vantive*, 283 F.3d at 1093. The class period in this case is nearly a year longer than the class period in *Vantive*; this suggests plaintiffs may

have greater difficulty than the *Vantine* plaintiffs alleging that particular stock sales support an inference of scienter.

Defendants argue that plaintiffs do not connect the individual defendants' stock sales to particular false statements. Rather, they contend, plaintiffs link the sales to Ixia's truthful announcement of the second restatement and its truthful announcement of an earnings miss. With one exception, the court agrees.[258] It appears that Ginsberg's May 2011 sales occurred shortly after Ixia's April 21, 2011 earnings report, which allegedly contained false statements.[259] For reasons discussed in greater detail below, however, this stock sale was not suspicious, and does not give rise to a compelling inference of scienter. Plaintiffs do not link the remaining sales to any false statement. Because "stock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements," *Vantive*, 283 F.3d at 1093, defendants contend that the only allegations in the second amended complaint that are potentially probative of scienter are those concerning Ginsberg's May 2011 sale.

Plaintiffs dispute this; they contend the fact that the individual defendants sold stock just prior to the announcement of the second restatement is indicative of insider trading, which is probative of scienter. The court agrees that the timing of certain of the sales could give rise to an inference that the trades were based on material inside information, i.e., the not-yet-announced second restatement. See *Glaser v. The9, Ltd.,* 772 F.Supp.2d 573, 587 (S.D.N.Y. 2011) ("Whether a particular stock sale qualifies as 'unusual' depends on a number of factors, including . . . whether sales occurred shortly before corrective disclosures or materialization of the alleged risk"); *Koplyay v. Cirrus Logic, Inc.*, No. CV 13-00790 CM, 2013 WL 6233908, *5 (S.D.N.Y. Dec. 2, 2013) (same). As in *Vantive*, however, the "class period is so long . . . it becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with [scienter] at the times they were made." *Vantive*, 283 F.3d at 1093. This is because the alleged fraud began roughly two years before the second restatement; it is therefore plausible that – to the extent the individual defendants engaged in insider

---

[258]SAC, ¶¶ 181-82, 184, 190-91, 200.

[259]*Id.*, ¶ 191.

66

trading – it was as a result of the fact that they discovered that Ixia had incorrectly – but innocently – accounted for deferred revenue, and made the trades to sell shares at a favorable price before the second restatement was announced. Absent the presence of other factors suggesting that the trades are suspicious, any inference that defendants knowingly inflated deferred revenue as much as two years earlier is tenuous at best. The court therefore examines whether plaintiffs' complaint supplies any additional allegations that would support drawing such an inference.

### (b) Amounts and Percentages of Sales

Plaintiffs allege that together, Alston, Miller, and Ginsberg sold more than 500,000 shares at a sales price of more than $9 million during the class period.[260] Defendants contend these amounts are not suspiciously large, especially because the class period is more than two years in length.[261] See *Vantive*, 283 F.3d at 1092-96 ("The plaintiffs allege that the defendants collectively sold 1,398,191 shares of stock totaling $36,383,386 in proceeds over the fifteen-month class period, amounting to an aggregate sale of 38% of the defendants' holdings. The district court determined that, although these figures represented a 'substantial' amount of trading, the allegations failed to raise a strong inference of fraud. Having examined the specific circumstances of each of the defendants' stock sales alleged in the complaint, and the circumstances of the defendants' stock sales overall, we agree with the district court").

The Ninth Circuit has concluded that there was no inference of scienter in a number of cases involving significantly larger sales. In *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001), for example, the Ninth Circuit affirmed dismissal of a complaint that alleged that seven of eleven insider defendants had sold 69% or more of their shares and options, and an eighth defendant had sold 98% of her shares, over the course of a considerably shorter class period than that here. *Id.* at 435-36. Likewise, in *Apple Computer*, 886 F.2d at 1117, the Ninth Circuit upheld the entry of summary judgment in defendants' favor where it was undisputed that they had sold $84 million worth of stock in a ten-month period. "These cases reveal that, by themselves, large numbers do not necessarily create

---

[260]SAC, ¶¶ 178, 188, 196.

[261]Motion at 17.

a strong inference of fraud." *Vantive*, 283 F.3d at 1093.     The percentage of shares the individual defendants allegedly sold also is not suspicious.  To determine whether sales are suspicious, the Ninth Circuit examines the percentage of shares sold over the entire class period.  See, e.g., *Metzler*, 540 F.3d at 1067 (examining stock sales and stating: "During the Class Period, Defendants Moore and Beal sold a total of $33 million of Corinthian stock; the sales constituted 37% of Moore's stock and 100% of Beal's"); *Ronconi*, 253 F.3d at 435-36 (analyzing the class period as a whole, not isolated transactions).

Plaintiffs allege that Alston sold 22.52% of his holdings on March 6, 2013, netting  nearly $1 million.[262]  They do not allege the total percentage of shares Alston sold over the entire class period, however, which, as noted, is the proper inquiry.  Even considering this single sale, moreover, the allegations do not plead facts that give rise to an inference of scienter.  Courts "typically require larger sales amounts . . . to allow insider trading to support scienter." *Metzler*, 540 F.3d at 1067 ("Digiovanni made no sales during the Class Period; Moore sold only 37% of his total stock holdings during the Class Period.  We typically require larger sales amounts – and corroborative sales by other defendants – to allow insider trading to support scienter," citing *Silicon Graphics*, 183 F.3d at 987-88 (no inference of scienter arose from the sale of 75.3% of defendants' holdings)); *Tripp v. Indymac Fin., Inc.*, No. CV07-1635GW, 2007 WL 4591930, *4-5 (C.D. Cal. Nov.29, 2007) (dismissing for lack of scienter where several individual defendants sold no stock, and the sales of sole defendant who did "were relatively small given his overall holdings").  The court thus cannot conclude that the fact Alston sold 22.52% of his shares is suspicious.

Plaintiffs also allege that Alston's overall holdings increased from 137,323 shares/exercisable options to 185,987 shares/exercisable options – or roughly 35% – during the class period; they contend the court should disregard this increase, however, because it is "solely" attributable to the vesting of restricted stock units or the vesting of options he did not exercise.[263]  The Ninth Circuit has rejected this argument.  Examining a similar contention, the *Silicon Graphics* court concluded there was "no reason to distinguish vested stock options from shares because vested stock options can be converted easily to

---

[262]SAC, ¶¶ 178-79.

[263]*Id.*, ¶ 180.

shares and sold immediately." See *Silicon Graphics*, 183 F.3d at 986-87; see also *id*. ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone. Therefore, a sale involving a significant portion of an insider's actual shares, but only a small portion of his shares and options combined, is less suspicious than were the insider to hold no options"). It is the "proportion of shares actually sold by an insider [compared] to the volume of shares he could have sold [that] is probative of whether the sale was unusual or suspicious." *Id.* (citing *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1427 (9th Cir. 1994)).

When vested stock options are included in the calculus, Alston "maintained more stock than [he] sold during the class period[, which] . . . strongly rebuts an inference of scienter on [his] part. . . ." See *Applestein v. Medivation, Inc.*, No. CV 10 0998 EMC, 2011 WL 3651149, *8 (N.D. Cal. Aug. 18, 2011); see also *Silicon Graphics*, 183 F.3d at 986 (no strong inference of scienter arose where, "[c]ollectively, the officers – even including the two who sold the greatest percentage of their holdings – retained 90 percent of their available holdings"); *In re Pixar Securities Litigation*, 450 F.Supp.2d 1096, 1105-06 (N.D. Cal. 2006) (noting that insiders' retention of more than 99% of their total holdings "undermine[d] any inference of scienter"); *In re FVC.com Secs. Litig.*, 136 F.Supp.2d 1031, 1038-39 (N.D. Cal. 2000) (concluding that stock sales were not sufficiently suspicious where "the defendants retained over 86% of their exercisable stock shares," and "all insiders (officers and directors) retained over 90% of their stock holdings"); cf. *Apple Computer*, 886 F.2d at 1118 (noting that "defendants retained the great bulk of their Apple holdings, and held on in the face of a decline in value of almost 75% following disclosure of Lisa's disappointing sales"). As alleged, therefore, the amount and percentage of sales by Alston is not suspicious and does not support an inference of scienter.

Plaintiffs allege that Ginsberg made various suspicious stock sales throughout the class period. As with Alston, they do not allege the total percentage of shares Ginsberg sold during the class period. Addressing the isolated sales plaintiffs identify, however, they do not give rise to a cogent and compelling inference of scienter. Plaintiffs assert that Ginsberg sold 75,000 shares for proceeds of $1,579,833 on February 12 and 13, 2013, or 13.3% of his total shares/exercisable options.[264] They also

---

[264]*Id*., ¶ 189.

allege that he sold 121,900 shares for proceeds of $1,947,369 on May 3, 4, 5 and 6, 2011, or 28.75% of his total shares/exercisable options at that time.[265] These figures are lower than those the Ninth Circuit typically finds suspicious. See *Metzler*, 540 F.3d at 1067 (noting that it "typically require[s] larger" sales than 37% of total shares); *Silicon Graphics*, 183 F.3d at 987-88 (no inference of scienter arose from the sale of 75.3% of defendants' holdings)). More fundamentally, plaintiffs admit that Ginsberg actually increased his holdings in Ixia stock over the class period. Plaintiffs attempt to explain the fact Ginsberg increased his holdings by arguing that the increase occurred "at the end" of the class period, and "mostly due to the vesting of options or restricted stock units."[266] As noted, the fact that Ginsberg ultimately "maintained more stock than [he] sold during the class period . . . strongly rebuts an inference of scienter on [his] part. . . ." See *Applestein*, 2011 WL 3651149, at *8. Thus, as alleged, the amount and percentage of sales by Ginsberg are not suspicious and do not support an inference of scienter.

Plaintiffs allege that Miller's actual holdings of Ixia stock decreased from 288,443 shares/vested options to 113,525 shares/vested options during the class period; this is a reduction of nearly 60%, even when new stock grants and options are considered.[267] Defendants assert that Miller held 206,726 shares/vested options at the end of the class period, which represents a decline of approximately 28%. They cite Appendix C to their request for judicial notice. The appendix and each of the judicially noticeable documents cited therein make clear that Miller held 113,525 *exercisable options* at the end of the class period.[268] The second amended complaint, however, fails to account for the fact that in addition to options, Miller also held 93,202 unrestricted shares.[269] Plaintiffs do not dispute that they relied on incorrect figures in their complaint; in fact, they accept as true defendants' contention that Miller held 206,726 shares at the end of the class period; they maintain, however, that a 28% drop is

---

[265]*Id*.

[266]*Id*., ¶ 195.

[267]SAC, ¶ 199.

[268]RJN, Appendix C at 1-2.

[269]*Id*.

70

nonetheless suspicious.  This is not alleged in the complaint, of course, due to plaintiffs' failure to include Miller's unrestricted shares in their calculation, and it is axiomatic that "a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."  *Broam v. Bogan*, 320 F.3d 1023, 1026 n. 2 (9th Cir. 2003) (citing *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998)).  Plaintiffs allege that Miller held 93,202 shares at the end of the class period.  Not only have plaintiffs disavowed this allegation, but it is contradicted by documents that are incorporated by reference in the complaint or proper subjects of judicial notice.  The court must therefore disregard it.  See *Black v. The Ritz-Carlton Hotel Co.*, LLC, 977 F.Supp.2d 996, 1010 (C.D. Cal. 2013) ("The court may disregard allegations in a complaint that are contradicted by matters properly subject to judicial notice," citing *Daniels–Hall  v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998 (9th Cir. 2010)); *Collins v. Wells Fargo Bank*, No. CV 12 2284 PHX LOA, 2013 WL 3808097, *7 (D. Ariz. July 23, 2013) ("Where a plaintiff's own allegations are  contradicted by other documents and matters asserted, relied upon, or incorporated by reference by plaintiff in the complaint, the district court is not obligated to accept the complaint's allegation as true in deciding a motion to dismiss," citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Van Buskirk v. CNN,* 284 F.3d 977, 980 (9th Cir. 2002)).  Accordingly, plaintiffs' allegations concerning Miller's stock holdings and sales do not give rise to an inference of scienter.[270]

Finally, defendants argue that the remaining individual defendant – Bhatnagar – sold *no* stock

[270]Had plaintiffs alleged that the percentage of shares Miller held dropped 28% during the class period, the court would still not find that this gives rise to an inference of scienter based on the facts alleged in the second amended complaint.  Miller's sales are significantly lower than the 37% at issue in *Metzler*, which the Ninth Circuit held was inadequate.  See 540 F.3d at 1067 ("Digiovanni made no sales during the Class Period; Moore sold only 37% of his total stock holdings during the Class Period. We typically require larger sales amounts – and corroborative sales by other defendants – to allow insider trading to support scienter").  Twenty-eight percent, moreover, constitutes approximately one-third of the 75.3% of sales a defendant made in *Silicon Graphics*.  See 183 F.3d at 987-88 (no inference of scienter with sales of 75.3% of holdings).  Finally, as discussed *infra*, Bhatnagar sold no stock and actually increased his holdings; Alston, too, increased his holdings.  As in *Tripp*, 2007 WL 4591930 at *4-5, Miller's sales, standing alone, are not sufficient to give rise to an inference of scienter.  See *id*. (dismissing for inadequate pleading of scienter where several individual defendants sold no stock, and the sales of the sole defendant who did "were relatively small given his overall holdings").

71

during the class period, and in fact increased his holdings.[271] Plaintiffs do not contend otherwise.[272] This too cuts against a finding that scienter is adequately pled due to allegedly suspicious trading activity. See *Metzler*, 540 F.3d at 1039 (a lack of stock sales by the COO indicated there was "no insider information from which to benefit"); *Vantive*, 283 F.3d at 1094 (the fact that the CEO sold only 13% of his shares during the class period tended to negate scienter because he presumably would have been the person in the best position to know the "true" facts); *In re FVC.com Securities Litigation*, 136 F.Supp.2d 1031, 1039 (N.D. Cal. 2000) (the fact that the CEO sold no stock during the class period "negate[ed] any slight inference of scienter"), aff'd, 32 Fed. Appx. 338 (9th Cir. Mar. 15, 2002) (Unpub. Disp.); accord *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that plaintiffs' claim that defendants artificially inflated a company's share price so they could sell their stock at a profit was undermined by the fact that one of the four defendants did not sell stock during the class period). In sum, as alleged, the amount and percentage of stock sales by the individual defendants were not suspicious and the sales cannot support an inference of scienter as a result.

### (c)     Timing of Sales

Defendants also maintain that the timing of the sales was not suspicious. "Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures"; thus, sales that follow closely on the heels of such disclosures are generally not suspicious. See *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures"); *In re Int'l Rectifier Corp. Securities Litigation*, No. CV07 02544 JFW (VBKx), 2008 WL 4555794, *20 (C.D. Cal. May 23, 2008) ("In addition, the timing of the sales are not suspicious. Both sales took place shortly after dates on which International Rectifier released earnings to the public, well over a year before International Rectifier announced its discovery of any accounting errors, and almost two years before it announced the fraudulent activities at the Japan subsidiary").

---

[271]Combined Motion at 19; BGM Motion at 3; Rieder Decl., Exh. 38 (Bhatnagar's Forms 4).

[272]Opposition at 29.

72

Plaintiffs allege that the suspicious trades occurred in three general time frames. First, plaintiffs allege that Ginsberg and Miller made suspicious trades in February 2013 and that Alston and Miller made suspicious trades in March 2013. They contend these trades were suspiciously timed because they were proximate to the issuance of the second restatement on April 3, 2013.[273] As noted, the second restatement corrected accounting errors, and it is not clear how insider trading shortly before its issuance gives rise to an inference that defendants knew of the accounting errors at the time they were made. More fundamentally, however, the sales plaintiffs identify took place within a month, and for the most part, within days, of Ixia's February 6, 2013 earnings announcement. Plaintiffs allege that this was "another 'record' quarter [for Ixia,] which yielded $124 million in revenues."[274] As noted, officers often sell their stock at such times. See *Lipton*, 284 F.3d at 1037; *Int'l Rectifier Corp.*, 2008 WL 4555794 at *20. Rather than suggesting an intentional misstatement of revenue, these trades more plausibly suggest that Ginsberg and Miller sold shares based on a positive earnings report. See *In re FVC.com Securities Litigation*, 136 F.Supp.2d 1031, 1040 (N.D. Cal. 2000) ("However, the opposite inference is equally, if not more, plausible. That is, that defendants did not sell between October 1998 and February 1999 because they honestly believed that FVC was going to post an annual profit for the first time and they wanted to wait until that announcement to sell their stock"), aff'd, 32 Fed. Appx. 338 (9th Cir. Mar. 15, 2002) (Unpub. Dispo.).

Finally, as plaintiffs allege, Alston and Miller sold significantly larger blocks of stock in February and March 2011; this shows that their February and March 2013 sales were not "dramatically out of line with prior trading practice." See *Ronconi*, 253 F.3d at 435; *Brodsky v. Yahoo! Inc.*, 630 F.Supp.2d 1104, 1118 (N.D. Cal. 2009) ("Plaintiffs have not alleged how the stock sales were designed to 'maximize the personal benefit' of any Defendant. Defendants regularly sold stock following earnings releases, which is common practice among corporate executives"); see also *Yanek v. Staar Surgical Co.*, 388 F.Supp.2d 1110, 1127-28 (C.D. Cal. 2005) ("Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings, such as STAAR's

[273]SAC, ¶¶ 8, 181, 190, 200.

[274]*Id.*, ¶ 96.

73

May 1, 2003 release of first quarter financial results.  The timing of the Bailey's lone stock sale is not 'dramatically' out of line with previous trading practice").[275]  For all of these reasons, the court cannot conclude that plaintiffs have alleged facts showing that the February and March 2013 trades were suspiciously timed.

Plaintiffs also maintain that the February and March 2011 sales were suspiciously timed.[276]  They contend that the sales were made when "Ixia's stock price was at a peak and shortly in advance of Ixia's announcement in July 2011 that it would miss its earnings estimates."[277]  Defendants counter, and the court agrees, that the sales did not occur at "peak prices."  The second amended complaint alleges that Ixia's share price peaked at $22.24 and fell to $18.37 following issuance of the second restatement.[278]  The February and March 2011 sales garnered a stock price of $19.00 or less;[279] this is more than $3 below the stock's "peak price" and "at about what the stock was worth[, i.e., $18.37,] after the bad news was public."  *Ronconi*, 253 F.3d at 435.  Plaintiffs' allegation that the February and March 2011 sales occurred shortly before Ixia's announcement in July 2011 that it would miss its earnings estimates,[280] is unavailing for two reasons.  First, there is nothing in the complaint plausibly suggesting that defendants were aware in February and March 2011 that Ixia would miss its second quarter earnings guidance.  More fundamentally, plaintiffs fail to explain how the fact that defendants may have known that Ixia would miss its earnings in the second quarter of 2011 gives rise to a cogent and compelling inference that they intentionally overstated deferred revenues.  As a result, the court cannot find the February and March 2011 sales suspicious.

Finally, plaintiffs allege that Miller made suspicious trades in April 2011, and that Miller and

---

[275]  Plaintiffs contend that the February and March 2011 sales are also suspicious, but the court finds their arguments unpersuasive for reasons stated *infra.*

[276]SAC, ¶¶ 182, 203.

[277]*Id.*, ¶ 182.

[278]*Id.*, ¶¶ 228-29.

[279]*Id.*, ¶¶ 117, 178, 196.

[280]*Id.*, ¶ 182.

74

Ginsberg made suspicious trades in May 2011.[281] These trades occurred nearly two years before the second restatement was issued, and at sale prices roughly $5 below Ixia's peak share price. Plaintiffs do not allege any facts as to why Miller's trades were suspiciously timed,[282] and the court cannot discern their reasoning or find that these trades give rise to an inference of scienter. Plaintiffs do allege that Ginsberg's May 2011 sales are suspiciously timed because they occurred after Ixia's April 21, 2011 earnings announcement, which purportedly contained false statements.[283] As noted, this is the only allegation plaintiffs link to an allegedly false or misleading statement. Their allegations, however, are insufficient to give rise to an inference of scienter because Ginsberg's May 4, 2011 Form 4 shows that he had an option to purchase 150,000 shares that was set to expire on May 7, 2011, and that he exercised the option and acquired the shares.[284] As a result, the most plausible inference to draw from Ginsberg's sale of 121,900 shares in May 2011 is that he exercised his soon-to-expire option to purchase 150,000 shares on May 2, 2011 and sold stock to cover the cost of those shares or maintain his overall holdings at a similar level.[285] This is not suspicious. See *In re Medtronic Inc. Securities Litigation*, 618 F.Supp.2d 1016, 1038 (D. Minn. 2009) ("[T]he timing of Collins' stock sales is explained largely by the expiration date of the options he exercised during the Class Period. Moreover, even if the timing of Collins' stock sales was considered by the Court to be suspicious, such timing is insufficient to establish a strong inference of scienter in the absence of any other information indicating unusual insider trading"). In fact, as Ginsberg's May 4 and 9, 2011 Forms 4 demonstrate, he actually acquired *more* shares than he sold in these trades.[286]

---

[281]*Id.*, ¶¶ 191, 198.

[282]See generally *id.*, ¶ 198.

[283]*Id.*, ¶ 191.

[284]Rieder Decl., Ex. 36 at 17-20 (Ginsberg's May 4 and 9, 2011 Forms 4).

[285]*Id.*

[286]*Id.* Ginsberg's May 4, 2011 Form 4 indicates that he exercised 159,375 options on May 2, 2011, sold 30,000 shares on May 3, 2011, and sold an additional 46,900 shares on May 4, 2011. His May 9, 2011 Form 4 reflects that Ginsberg then sold 15,500 shares on May 5, 2011, and 29,500 shares on May 6, 2011. As a result, Ginsberg *increased* his holdings by 37,745 shares.

**(d)      Conclusion Regarding Suspicious Trades**

Plaintiffs fail to plead facts showing that scienter can be inferred from suspicious stock sales by the individual defendants.  With the exception of one trade by Ginsberg, plaintiffs do not link any of the allegedly suspicious trades to a purportedly false or misleading statement.  Their allegations regarding the percentage of shares sold also do not show suspicious trading given Ninth Circuit authority on that subject.  Finally, plaintiffs do not adequately allege that the timing of the stock sales was suspicious, as nearly all occurred when Ixia shares were trading below their peak price and following closely on the heels of earnings reports.  Plaintiffs thus have not pled that the stock sales were "'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  *Am. W. Holding Corp.*, 320 F.3d at 938 (quoting *Silicon Graphics*, 183 F.3d at 986 (in turn quoting *Apple Computer*, 886 F.2d at 1117)).  Accordingly, the court cannot infer scienter from the individual defendants' alleged stock sales.

**(3)      Alston's Resignation and PwC's Decision Not to Stand for Reappointment**

Defendants also assail plaintiffs' argument that Ixia's explanation of Alston's resignation was a pretext designed to conceal his involvement in the fraudulent inflating of deferred revenue during the class period.[287]  In dismissing the first amended complaint, the court concluded that allegations regarding Alston's resignation did not give rise to an inference of scienter because plaintiffs pled no facts that cast doubt on the reasonable assumption that Alston resigned (or was forced to resign) because he lied about his academic credentials, age, and employment history.  Absent additional allegations that suggest the reasons given for Alston's resignation were pretextual, the court stated, it could not conclude that plaintiffs had raised a strong inference of scienter based on the treatment of Alston's resignation.[288]  See *Zucco Partners* 552 F.3d at 1002 ("Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to

---

[287]Combined Motion at 24.

[288]Order at 55.

76

resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons"); *In re U.S. Aggregates, Inc. Securities Litigation*, 235 F.Supp.2d 1063, 1074 (N.D. Cal. 2002) ("Plaintiff can point to no particularized allegation refuting the reasonable assumption that [defendant's employee] was fired simply because the errors that [led] to the restatement occurred on his watch or because he failed adequately to supervise his department").

Plaintiffs' allegations in the second amended complaint are substantively identical to those in the first amended complaint.  As defendants argue, therefore, it remains the case that plaintiffs have not alleged facts that call into question the reasonable assumption that Alston resigned because he lied about his academic credentials, age, and employment history.  Allegations regarding the resignation are thus insufficient to give rise to a strong inference of scienter.

Plaintiffs now allege that PwC's decision not to stand for reappointment supports an inference of scienter, however.[289]  Although plaintiffs did not include allegations to this effect in their first amended complaint, they argued in their opposition to defendants' motion to dismiss that complaint that the fact PwC declined reappointment was a "red flag" that could show scienter rather than negate it. The cases they cited, however, concerned allegations of more than merely the reaction of a company's auditors to its accounting errors.  More fundamentally, the court observed that the cases concerned auditors' decision to *resign*, not situations in which auditors decline reappointment.  See *McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 126-27 (S.D.N.Y. 2013) ("Plaintiffs have pled a number of 'red flags' that contribute to support a reasonable finding of scienter.  Plaintiffs have alleged that investigators visited CCME's facilities and found that no employees were actually working.  They have also alleged that the CFO, two board members, and the independent auditor resigned"); *In re Spear & Jackson Secuirites Litigation*, 399 F.Supp.2d 1350, 1358 (S.D. Fla. 2005) (listing "auditor resignations" as one of several indicia of scienter courts consider).  There are many reasons PwC might have elected not to stand for reappointment; absent facts that link the decision to concerns about the candor of Ixia's management (e.g., statements by

_____

[289]SAC, ¶¶ 222-23.

the auditors to that effect), the fact that the firm did so does not give rise to an inference of scienter.

### (4)    Conclusion Regarding Individual Allegations of Scienter

Plaintiffs allegations that defendants' GAAP violations, purportedly suspicious stock sales, Alston's resignation, and PwC's decision not to stand for reappointment as Ixia's auditor do not give rise to a cogent and compelling inference of scienter under the PSLRA.  Accordingly, the court turns to a holistic review of the allegations.

### b.    Holistic Review

As noted, even if individual allegations of scienter are not sufficient to give rise to a "strong inference" of knowledge or recklessness, the court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council*, 641 F.3d at 1095; *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("We find that the totality of the allegations does create a strong inference that Oracle acted with scienter, and we reverse the District Court").  Under this standard, "[v]ague or ambiguous allegations are . . . considered as a part of [the] holistic review . . . [because] the federal courts . . . need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784.  Even when a court is conducting a holistic review, however,"if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006.  As the Supreme Court has instructed, the analysis is a comparative one. *Tellabs*, 551 U.S. at 310 ("The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff").

Although in this case, the whole is indeed somewhat greater than the sum of its parts, the facts pled do not give rise to a "strong inference" of scienter that is as compelling as plausible

78

innocent explanations. As the court noted in its order dismissing the first amended complaint, plaintiffs paint the picture of a corporation whose ability to portray itself as a growth company was heavily dependent on suggesting that it had a substantial amount of deferred revenue due to maintenance and service contracts. They assert the company was not growing as fast as the market wanted, and began artificially to deflate current quarterly revenue to book deferred revenue suggesting future growth. As for competing inferences, however, the words of the *Zucco Partners* court are instructive:

> "Although the allegations in this case are legion, even together they are not as cogent or compelling as a plausible alternative inference – namely, that although [Ixia] was experiencing problems controlling and updating its accounting and [recognition of revenue from software warranty and maintenance contracts], there was no specific intent to fabricate the accounting misstatements at issue here." See 552 F.3d at 1007.

Given the lack of allegations that any defendant knew the relevant accounting rules, and knew they were being violated, the facts alleged are equally, if not more, susceptible of the interpretation that Ixia, although dedicated to growth, simply misreported deferred revenue in the midst of a series of acquisitions and the integration of new businesses and revenue streams into its preexisting corporate business. Even viewed holistically, plaintiffs' allegations do not strongly support an inference that Ixia intentionally understated its present revenue in order artificially to increase its deferred revenue. Indeed, because the second amended complaint still fails to supply facts giving rise to a cogent and compelling inference of scienter, the basis of plaintiffs' fraud theory – that investors preferred to have the company report more future than *present* revenue – remains as unpersuasive on the face of the second amended complaint as it did on the first amended complaint.

The fact that Ixia was required to issue the first restatement – for fiscal years ended December 31, 2003, December 31, 2004, and December 31, 2005, and quarters ended March 31,

79

2006, June 30, 2006, and September 30, 2006 – does not change this conclusion.[290]  The first restatement was necessitated by improper accounting for revenue related to Ixia's software and maintenance contracts.  As defendants note, however, the first restatement was required because Ixia had *overstated* current revenue derived from warranty and service contracts.[291]  Viewed in combination with the second restatement, which involved the *understatement* of current revenue generated by the service and maintenance contracts, and the third restatement, which involved *overstatement* of current revenue, the first restatement suggests that Ixia had ongoing difficulties properly accounting for its software service and maintenance contracts, or perhaps that it was grossly negligent in accounting for the revenue.  What plaintiffs must allege, however, is "a degree of recklessness that strongly suggests actual intent."  *Silicon Graphics*, 183 F.3d at 979.

Plaintiffs' allegations concerning the fact that Ixia hired Will Liang as a revenue recognition expert further support an inference that Ixia had ongoing problems properly accounting for its service and warranty contract revenue, to the point that it hired a specialist in that area.  Based on the allegations in the complaint, it is at least as plausible that management was unable to control Ixia's accounting practices during the company's fast-paced integration of new acquisitions than that it was systematically manipulating the accounting to make it appear that the Ixia was making *less* money than was true in reality.

In pleading scienter, "[t]he requisite recklessness must be an 'extreme departure from the standards of ordinary care, and . . . present[ ] a danger of misleading buyers that is either known to

[290]SAC, ¶ 29 ("On February 23, 2007, Ixia announced that it was restating its Forms 10-K for the years ended December 31 2003, December 31, 2004 and December 31, 2005, as well as its Forms 10-Q for the quarters ended March 31, 2006, June 30, 2006 and September 30, 2006. Ixia announced that in order to comply with [GAAP], it had 'made certain restatement adjustments that affect revenues, operating results, and deferred revenues for each of the restated periods. . . ." Among other things, this First Restatement involved the way Ixia was accounting for its revenue for software service and warranty contracts.  In particular, Ixia indicated that the adjustments related to how much of the total revenue from customer support contracts should be allocated to the deferred revenue category on Ixia's financial statements.").  See also *id.*, ¶¶ 167-68 (discussing how the first restatement purportedly placed defendants on notice).

[291]Rieder Decl., Ex. 13 at 10 (listing total revenues as initially reported and total revenues as restated).

the defendant or so obvious that the actor must have been aware of it.'" *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Silicon Graphics*, 183 F.3d at 984). Plaintiffs have failed to satisfy this stringent pleading standard, and therefore defendants' motion to dismiss must be granted.[292] Because it appears plaintiffs may be able to cure the pleading deficiencies, however, the court grants them leave to amend.

**G.      Whether Plaintiffs Adequately Allege a Violation of Section 20(a) of the 1934 Act**

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. It provides:

> "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

A *prima facie* case of control person liability requires allegations (1) that a primary violation of the securities laws has occurred and (2) that defendant directly or indirectly controlled the person or entity committing the primary violation. See, e.g., *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Paracor Finance*, 96 F.3d at 1161. Plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing. *Id.* (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993)). "Section 20(a) claims may be dismissed summarily . . . [however,] if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco Partners*, 552 F.3d at 990. Because the court has dismissed plaintiffs' section 10(b) and Rule 10b-5 claims, there is no primary violation upon which to predicate section 20(a) liability. Consequently, it dismisses

---

[292]Because plaintiffs failed adequately to allege scienter as to any defendant, the court need not address Bhatnagar's argument that the complaint insufficiently pleads scienter on his part because he left Ixia early in the class period. (BMG Motion at 7-8.) The same is true of Alston's argument that plaintiffs have failed to plead he acted with scienter because they do not allege he was involved in any accounting decisions concerning revenue recognition. (Alston Motion at 5-6.) Plaintiffs should nonetheless take these defendants' arguments into account in drafting any future amended complaint to remedy deficiencies in the pleading of scienter.

plaintiffs' § 20(a) claim.[293]

### III.  CONCLUSION

For the reasons stated, the court grants defendants' motion to dismiss the second amended complaint in its entirety with leave to amend.  Plaintiffs may file an amended complaint within thirty (30) days of the date of this order.

DATED: April 14, 2015

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[293]Since plaintiffs have failed adequately to allege a primary violation, the court cannot conclusively address control person liability.  The individual defendants' arguments concerning control person liability bear some mention, however.  They assert first that plaintiffs have failed to plead control person liability based on their relationship with Ixia.  Specifically, they maintain that to allege the "control" element, plaintiffs "must plead . . . that defendants exercised 'a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations.'"  *In re McKesson HBOC, Inc. Securities Litigation*, 126 F.Supp.2d 1248, 1277 (N.D. Cal. 2000); see also *Lilley v. Charren*, 936 F.Supp. 708, 716 (N.D. Cal. 1996) ("[P]laintiffs must allege facts showing that each defendant possessed the actual power to control the person primarily liable").

Control person liability is "an intensely factual question."  *Howard*, 228 F.3d at 1065.  Thus, all allegations in the complaint must be considered to determine if plaintiffs have adequately pled that any individual defendant exercised a significant amount of control over the operations of the company.  See *Batwin v. Occam Networks, Inc.*, No. CV 07–2750 CAS (SHx), 2008 WL 2676364, *25 (C.D. Cal. July 1, 2008) ("'The traditional indicia of control are: having a prior lending relationship, owning stock in the target company, or having a seat on the board,'" quoting *In re Surebeam Corp. Securities Litigation*, No. 03 CV 1721JM(POR), 2005 WL 5036360, *25 (S.D. Cal. Jan. 3, 2005) (in turn citing  *Paracor Finance*, 96 F.3d at 1162); see also *Kyung Cho v. UCBH Holdings, Inc.*, 890 F.Supp.2d 1190, 1208 (N.D. Cal. 2012) ("Although not all courts agree, numerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status," citing *In re Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534, 550-51 (N.D. Cal. 2009), and *In re Amgen Inc. Securities Litigation*, 544 F.Supp.2d 1009, 1037 (C.D. Cal. 2008)).  Given its dismissal of the primary violation claims, the court need not assess the adequacy of plaintiffs' allegations against Alston, Ginsberg, Bhatnagar, and Miller in detail at this time.